*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

EDWARD JEROME HARBISON,

       *Petitioner-Appellant,*

    *v.*

RICKY BELL, Warden,

       *Respondent-Appellee.*

No. 02-5392

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 97-00052—Curtis L. Collier, District Judge.

Argued: December 2, 2004

Decided and Filed: April 29, 2005

Before: SILER, CLAY, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Dana C. Hansen Chavis, FEDERAL DEFENDER SERVICES, Knoxville, Tennessee, for Appellant. Gordon W. Smith, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Dana C. Hansen Chavis, FEDERAL DEFENDER SERVICES, Knoxville, Tennessee, Rosemarie L. Bryan, SHUMACKER, WITT, GAITHER & WHITAKER, Chattanooga, Tennessee, for Appellant. Gordon W. Smith, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

    SILER, J., delivered the opinion of the court, in which COOK, J., joined. CLAY, J. (pp. 13-21), delivered a separate dissenting opinion.

_____

## OPINION

_____

    SILER, Circuit Judge. Petitioner Edward Jerome Harbison was convicted of first-degree murder, second-degree burglary, and grand larceny and was sentenced to death. After unsuccessful direct appeal and state post-conviction proceedings, Harbison filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Tennessee. Harbison argues that the district court erred in failing to issue the writ. Certificates of appealability were granted to allow consideration of Harbison's claims relating to an alleged *Brady* violation, ineffective assistance of appellate counsel, and conflict of interest of appellate counsel. For reasons discussed hereafter, the denial of Harbison's petition is AFFIRMED.

## I.    BACKGROUND

On January 15, 1983, Frank Russell returned home from work to discover that his wife, Edith, had been murdered.  The Russells rented an apartment at the back of their Chattanooga, Tennessee, house to a tenant who, at that time, was away on vacation, and Mrs. Russell's body was found inside this apartment.  Medical examiners determined that the cause of her death was "massive multiple skull fractures with marked lacerations of the scalp and head, expelling brain tissue and literally crushing the victim's face and disfiguring her beyond recognition." *State v. Harbison*, 704 S.W.2d 314, 316 (Tenn. 1986).  Mrs. Russell was last seen that afternoon at a neighborhood market, where witnesses spoke with her between approximately 2:30 and 2:45 p.m.  Bags of groceries and ignition keys were found in Mrs. Russell's car, which was parked in the driveway, when her body was discovered near midnight.  Nothing in the record indicates a precise time of death.  The logical inference is that Mrs. Russell was killed a short time after purchasing the groceries in the middle of the afternoon, or else she would have taken them and her keys out of her car.  Moreover, the porch lights were off.  Her husband said she always left the outside lights on for protection.

The Russells' house and the rented apartment were burglarized.  Missing items included "an RCA XL-100 television, two cable television converters, a quartz heater, a Polaroid 210 camera, a silver Cross pen and pencil set, a jeweler's loop, a jewelry box, antique jewelry, a marble vase, and Mrs. Russell's purse." *Id*.  The police later found the quartz heater, the Polaroid camera, the pen and pencil set, and the jeweler's loop in the residence of Janice Duckett, who was Harbison's girlfriend and co-defendant David Schreane's sister.  The jeweler's loop was found in Harbison's shaving kit.  In an adjacent unoccupied apartment, the police found Mrs. Russell's purse, a jewelry box, and two large paper bags containing antique glassware and brassware.  The stolen television was found in the residence of Schreane's girlfriend.

Schreane was taken into custody and questioned on February 21, 1983, when he led police to the missing marble vase.  Chemical testing later revealed the presence of blood on the vase.  Furthermore, debris that was vacuumed from the carpet in Harbison's car revealed crystalline calcite fragments that were consistent with the marble vase.

Harbison also was arrested on February 21, 1983.  In a taped statement, he confessed to killing Mrs. Russell.  Harbison stated that after he drove his girlfriend home from work, he and Schreane went to the Russell home, determined that it was empty, and used a screwdriver to break into the residence.  While he and Schreane were carrying the stolen items from the house and the apartment to their car, Mrs. Russell returned home.  Harbison contended that he thought Mrs. Russell was reaching for a gun, so he grabbed her.  He stated that he hit her with the marble vase, "at the most" two times.

At his trial, Harbison testified that he had not killed Mrs. Russell and that he was not at the Russell house on the day of the murder.  He said that he was at his girlfriend's home that afternoon and evening.  He asserted that his confession was coerced, and that the police had threatened to arrest his girlfriend and take away her children if he did not confess.  He further testified that the police had told him what to say and that his taped confession, which was played to the jury, had been altered.  Finally, he testified that he had purchased the jeweler's loop at a pawn shop.

William Carter and Vaughn Miller represented Harbison at trial.  Before the trial, they made the following discovery requests for exculpatory evidence: a motion for discovery (4/13/1983), a motion for exculpatory evidence (4/13/1983), and a motion to compel disclosure (10/21/1983).  As discussed below, they did not receive certain Chattanooga Police Department records, however.

Harbison was convicted and sentenced to death. At sentencing, his trial attorneys presented little mitigation evidence. The only witness offered was Harbison's mother, who briefly testified that he was a good son, was regularly employed, and completed the eleventh grade of school.

After Harbison's trial attorneys filed a motion for new trial, Harbison requested new counsel, and the court appointed Rodney Strong. Strong filed an amendment to the motion for new trial, adding allegations of ineffective assistance of counsel. He asserted that Harbison's trial attorneys were ineffective because they failed to adequately investigate and present witnesses in support of the defense. Strong argued on appeal that the trial attorneys had made no effort to locate witnesses to pursue Harbison's alibi defense. The conviction and sentence were affirmed by the Supreme Court of Tennessee. *Harbison*, 704 S.W.2d at 319-20.

Thereafter, Harbison filed a post-conviction petition in the trial court. Harbison argued, *inter alia*, that Strong, his appellate counsel, was ineffective because he did not argue that Harbison's trial attorneys were ineffective for failing to investigate his family background for purposes of mitigation.

At the post-conviction hearing, Harbison presented evidence of a previously undisclosed family tragedy. When he was a child, his fourteen-year-old sister shot and killed her two young children. She was committed to a state hospital, where she committed suicide. Harbison, his mother, and another sister testified that the family was affected by these events. Harbison stated that he "couldn't rightly say . . . what kind of impact it had on [him]." In addition, they testified that Harbison's trial attorneys had never asked about the family background.

Carter, one of Harbison's trial attorneys, also testified that he and Miller did not complete a significant investigation into Harbison's family background and only discussed in passing a possible psychological examination for Harbison. Carter further acknowledged that they had only briefly prepared Harbison's mother for her sentencing testimony during a break at trial.

The trial court dismissed Harbison's post-conviction petition as being without merit. The Tennessee Court of Criminal Appeals affirmed this decision, *Harbison v. State*, No. 03C01-9204-CR-00125, 1996 WL 266114 (Tenn. Crim. App. May 20, 1996), and the Supreme Court of Tennessee denied further review.

In February 1997, Harbison moved in federal district court for appointment of counsel and stay of execution. These motions were granted. The appointed counsel made a public-records request for the Chattanooga Police Department's records relating to the Russell murder. These documents were received in October 1997, and it was determined that documents in the police file were not in the district attorney's file.

The police files contained evidence regarding Ray Harrison, who initially was a suspect in this case. Harrison previously was represented by Rodney Strong, who later was appointed to be Harbison's appellate counsel. Harrison, upon Strong's advice, refused to take a polygraph examination concerning Russell's murder. Strong did not disclose to Harbison his prior representation of Harrison, however.

The police files indicate that Harrison's wife told David Boss that Harrison had admitted to her that he was at the Russell house at the time of the murder. According to Boss, she said, "He was in the house, he didn't kill her but . . . when the door opened they ran." Boss told the police that Harrison was shaky and "scared to death" the day after the murder. Another witness stated that Harrison's wife was concerned because she could not find the jacket Harrison was wearing the day of the murder. These files also indicate that Harrison had a disagreement with Mrs. Russell the week before her murder concerning a ring that he attempted to sell to her. Mrs. Russell took the ring to an appraiser, who determined that the ring was fake. Harrison suspected Mrs. Russell switched the real ring for a fake one. The file indicated that Harrison associated with men who lived in the Lynn

house, which was across the street from the Russells. Schreane had previously admitted that he was smoking marijuana with Linda Lynn in a parked car in front of the Lynn house on the day of the murder, thus establishing a very tenuous connection between Harrison and Schreane. Finally, the file indicated that Harrison previously was involved in a similar burglary, in which a home owner returned and a struggle ensued.

The police files also contained information about Schreane, who implicated Harbison in the crime. Prior to Harbison's detainment, Schreane told a witness that Harbison, who was dating Schreane's sister, had attempted to start a relationship with Schreane's girlfriend when Schreane was arrested on an unrelated offense. According to a witness, Schreane asserted that Harbison had killed Mrs. Russell and that he would "be up there with him for that murder case."

Harbison filed a petition for writ of habeas corpus in November 1997. He asserted twenty-six claims as grounds for relief, including a *Brady* claim, a claim of conflict of interest of appellate counsel who had previously represented a suspect in the case, and an ineffective-assistance-of-appellate-counsel claim for failure to raise on direct appeal the issue that trial counsel was ineffective for failing to investigate Harbison's background. At the time, the *Brady* and conflict-of-interest claims had not yet been advanced to a state court.

The district court dismissed Harbison's petition as meritless in March 2001. It granted Harbison a COA for the following issues: 1) whether the prosecution withheld material, exculpatory evidence from Harbison in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and 2) whether Harbison received ineffective assistance of appellate counsel because counsel did not argue on direct appeal that his trial attorneys rendered ineffective assistance by failing to adequately investigate and present evidence of his troubled family background. This court granted Harbison a COA for one additional issue: whether appellate counsel labored under a conflict of interest.

In June 2001, after the district court denied Harbison's petition, he filed a motion to reopen his state post-conviction proceeding. He later requested that the pleadings be treated as a petition for a writ of error coram nobis. Claims involving the issues for which certificates of appealability have been granted were considered in these state proceedings. In March 2004, after holding an evidentiary hearing, the state court dismissed the motion to reopen, noting that the circumstances in which a post-conviction proceeding could be reopened were strictly limited by Tenn. Code Ann. § 40-30-217.[1] The court also dismissed Harbison's petition for writ of error coram nobis because it was not timely filed and it determined that too much time had elapsed between Harbison's discovery of the evidence and his filing in state court. The court concluded that there was no due process violation because Harbison had been afforded a reasonable amount of time to litigate these issues.

In May 2004, Harbison moved this court to supplement the record with the new state-proceeding evidence and/or to hold in abeyance pending the resolution of the state-court appeal. These motions were denied, and the record before the district court is considered in this appeal.

## II.    STANDARD OF REVIEW

Harbison filed the petition for writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Therefore, this court's review is limited by 28 U.S.C. § 2254(d), as amended by AEDPA. Under this provision, an application for writ of habeas corpus may be granted only if the adjudication of the claim in the state-court proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

---

[1] This provision has been renumbered to § 40-30-117 (2003).

established Federal law, as determined by the Supreme Court of the United States," or if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The Supreme Court has emphasized that the statutory phrase "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), "refers to the holdings, *as opposed to the dicta*, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (emphasis added). Once the "clearly established Federal law" has been identified, this court considers whether the state-court decision is "contrary to" such law. A state-court decision is contrary to clearly established law if that court "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decide[d] a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. The court also considers whether the state court's decision involved an unreasonable application of clearly established Federal law. This occurs if the court "identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Id*. It is important to note, however, that "an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Id.* at 412. This court must determine "whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

## III.    DISCUSSION

### A.    Ineffective Assistance of Appellate Counsel

Harbison asserts that Strong, who represented him in his motion for new trial and on direct appeal, was ineffective because he failed to argue that Harbison's trial attorneys were ineffective for failing to investigate and present evidence of Harbison's family background. This claim was asserted in Harbison's post-conviction petition. The Tennessee Court of Criminal Appeals affirmed the trial court's dismissal of this claim on the merits, and the Supreme Court of Tennessee denied Harbison's request for further review.

The Tennessee Court of Criminal Appeals determined that the performance of Harbison's trial attorneys did not fall below an objective standard of competency. The court considered, *inter alia*, the fact that the trial attorneys had no knowledge that Harbison or any of his family members had a history of mental illness. The court also noted that the mental illness information provided in the post-conviction hearing related solely to Harbison's family and not directly to Harbison himself. The court considered the analysis in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and determined that the trial attorneys' performance was not deficient; therefore, the court did not discuss whether Harbison was prejudiced by the allegedly deficient performance of his trial attorneys. The court concluded that, because the trial attorneys' performance was not ineffective, Strong's performance also was not ineffective. Harbison was not prejudiced by an alleged failure to raise the ineffective assistance claim on direct appeal.

"A defendant is entitled to the effective assistance of counsel in his first appeal of right." *Mapes v. Tate*, 388 F.3d 187, 191 (6th Cir. 2004). The performance of an appellate counsel is properly reviewed under the *Strickland* standard. "To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient *and* that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable." *Id*. (citing *Strickland*, 466 U.S. at 687).

Although Harbison's trial attorneys' failure to investigate Harbison's family background arguably may have been deficient performance, the evidence presented in Harbison's state court

post-conviction proceeding did not establish prejudice. Therefore, Harbison failed to establish ineffective assistance of counsel. "[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 692. Harbison "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. At Harbison's post-conviction hearing, he, his mother, and his sister testified regarding another sister's murder of her children and her subsequent suicide. While they testified that Harbison was affected by these events, their testimony was vague and did not address any manifestations of this impact. Indeed, Harbison himself testified that he "couldn't rightly say . . . what kind of impact it had on [him]." Thus, this evidence was insufficient to create a reasonable probability that the result would have been different had this information been presented at sentencing. Because Harbison did not demonstrate that he was prejudiced by Strong's actions, the state court's determination that Harbison had not established ineffective assistance of counsel was not an unreasonable application of clearly established federal law. *See Williams*, 529 U.S. at 413.

## B.    *Brady* Claim

To demonstrate that the withholding of police reports was a *Brady* violation, Harbison must prove that (1) the evidence at issue is favorable to him; (2) the State, either willfully or inadvertently, suppressed that evidence; and (3) prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281. To determine whether there is such probability, the withheld evidence must be considered collectively. *Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003) (citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)).

The district court concluded that Harbison's *Brady* claim was procedurally defaulted. As discussed below, we agree. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal citations omitted).

Harbison first asserted this alleged *Brady* violation in proceedings before the district court in November 1997. At that time, Tenn. Code Ann. § 40-30-202(c)[2] provided that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment." Because Harbison had previously filed one petition for post-conviction relief, he was not permitted to file a second petition. Furthermore, because the circumstances in which a post-conviction proceeding could be reopened were strictly limited by Tenn. Code Ann. § 40-30-217,[3] Harbison was unable to reopen his post-conviction proceedings in 1997. *See Harris v. State*, 102 S.W.3d 587, 591 (Tenn. 2003) ("A claim that the State suppressed or failed to disclose exculpatory evidence in violation of *Brady* simply is not one of the statutory grounds for reopening a post-conviction proceeding.").

Harbison also would not have been able to pursue a petition for a writ of error coram nobis at the time he filed in the district court. "Coram nobis claims may be based upon any 'newly discovered evidence relating to matters litigated at the trial' so long as the petitioner also establishes that [he] was 'without fault' in failing to present the evidence at the proper time." *Id.* at 592-93. These claims must be filed within one year after a conviction becomes final. Tenn. Code Ann. § 27-

---

[2] This provision has been renumbered to § 40-30-102 (2003).

[3] This provision has been renumbered to § 40-30-117 (2003).

7-103. The Tennessee courts have, at times, allowed exception to strict enforcement of statutes of limitations, however. "[D]ue process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992). As noted by the Supreme Court of Tennessee, "due process may prohibit strict application of the statute of limitations in a post-conviction case 'when the grounds for relief, whether legal or factual, arise after . . . the point at which the limitations period would normally have begun to run.'" *Sample v. State*, 82 S.W.3d 267, 272 (Tenn. 2002) (quoting *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995)).

When such a case is evaluated, a "court must determine whether application of the limitations period would deny the petitioner a reasonable opportunity to present the claim by balancing the liberty interest in collaterally attacking constitutional violations occurring during the conviction process . . . against the State's interest in preventing the litigation of stale and fraudulent claims." *Id.* at 272-73 (quotations omitted). The Supreme Court of Tennessee has refused "to apply a bright-line period of time in which to raise later-arising issues be it one year or three," *Wright v. State*, 987 S.W.2d 26, 30 (Tenn. 1999), but has instead instructed that the analysis be completed "in light of the specific facts of the case." *Id.*

Although Harbison did not receive the police files that contained the evidence that is the basis of this claim until October 1997, he could have requested and obtained those files more than five years earlier. In January 1992, the Tennessee Court of Appeals held in an unpublished decision that police investigation files were not exempt from disclosure under the Public Records Law. *Capital Case Res. Ctr. of Tenn., Inc. v. Woodall*, No. 01-A-019104CH00150, 1992 WL 12217 (Tenn. Ct. App. Jan. 29, 1992). Based upon the *Woodall* decision, the Supreme Court of Tennessee has recognized January 29, 1992, as a date upon which police files became available to a post-conviction petitioner.[4] *Wright*, 987 S.W.2d at 29.

Harbison alleges in his brief that "counsel attempted post-trial to gain access to the police records despite state law prohibiting their disclosure," but "one of the investigating detectives and the police chief testified post-trial that the police records could not be located." A review of the transcripts to which Harbison refers suggests the individuals were simply unaware of a particular file's location, not that these individuals had been charged with the task of locating that particular file. At the post-conviction examination, Detective Wilhoit simply stated, "I don't have any knowledge as to [Detective Foster's file's] location. It's an old case and normally we keep our old files after the case is over with, so what he did with it I have no information." The following exchange occurred when Chief Detective Davis was questioned at a post-conviction evidentiary hearing:

> Q:    Do you have access to any of the former files at the police department where you could refer to these?
> A:    No.
> Q:    We've been told by C.L. Wilhoit that since Ed Foster's death that they have apparently lost his file on Harbison. Would there not be any other?
> A:    I don't see how they could have lost it. Of course, I don't know.

---

[4] Harbison argues that these files were not available to him until the published decision of *Wooden v. State*, 898 S.W.2d 752 (Tenn. Crim. App. 1994), in December 1994. The *Wooden* court merely asserted, however, that prior to yet another unpublished opinion, *Freeman v. Jeffcoat*, No. 01A01-9103-CV-00086, 1991 WL 165802 (Tenn. Ct. App. Aug. 30, 1991), "police routinely denied [defendants] access to the file." *Wooden*, 898 S.W.2d at 754. The court noted that Wooden had been able to obtain police records under the Tennessee Public Records Law pursuant to the decision in *Freeman*.

> Q:      That's what he testified to is that they lost it because they couldn't bring it to court. Would you have any idea that they would have another one anywhere that we might be able to get access to it?
> A:      *They have it if they'd just find it.*
> Q:      Okay. So you think they've misplaced it as opposed to losing it?
> A:      I know it was still there when I left.
> Q:      When did you leave?
> A:      '83.
> Q:      Okay. Of course, Detective Foster has died since then?
> A:      Yes, but there is no way for it to have got out of there unless somebody stole it. *It's still there.*

If anything, the exchanges between Harbison's attorney and Detective Wilhoit and Chief Detective Davis would have indicated to the attorney that there was a very strong possibility that the relevant files would be available if requested through the appropriate channels.

Furthermore, because disclosure of the police files was prohibited in 1991, when Harbison had last requested them, it is not unreasonable to expect that he again would request them within a reasonable time after they could be released. The files became available in 1992, but Harbison waited another five years to request them. As a result, by the time Harbison filed his petition in the district court in 1997, Tennessee courts were no longer able to consider a petition for writ of error coram nobis. The aforementioned statements from Detective Wilhoit and Chief Detective Davis are insufficient to justify the five-year delay. It cannot be said that the basis of this claim was "reasonably unknown" to petitioner's lawyers.

Harbison argues his *Brady* claim was not procedurally defaulted because this procedural scheme is neither adequate nor independent. *See, e.g., Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004) ("[T]he state procedural rule must have been an adequate and independent state procedural ground upon which the state could rely to foreclose review of a federal constitutional claim."). In *Hutchinson v. Bell*, this court recognized that "Tennessee courts consistently enforce a procedural scheme that encompasses both the one-year limitations period and a court-recognized procedure for tolling that statute when specific due process grounds are presented." 303 F.3d 720, 738 (6th Cir. 2002). Harbison asserts that these procedural rules do not represent adequate state procedural grounds because the *Burford* principle may create inconsistent results. He further asserts that the procedural grounds are not independent of federal law because application of *Burford* to a later-arising *Brady* claim requires consideration of the merits of the *Brady* claim. "In habeas, if the decision of the last state court to which the petitioner presented his claim fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). An evaluation of the adequacy and independence of a hypothetical state court decision is unnecessary in this case, however:

> [I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred . . . there is a procedural default for purposes of federal habeas *regardless of the decision of the last state court* to which the petitioner actually presented his claims.

*Id*. at 735, n.1 (emphasis added).

Because this claim has been procedurally defaulted, it may be considered on its merits only if Harbison demonstrates cause and prejudice. *Bousley*, 523 U.S. at 622. Harbison argues that the State's failure to provide him with the police files demonstrates cause. He asserts that "[t]he cause

inquiry . . . turns on events or circumstances external to the defense." *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (quotation omitted). In *Banks*, the Supreme Court rejected a state's argument that the cause inquiry should revolve around the petitioner's conduct, which in that case included an alleged lack of appropriate diligence in pursuing a *Brady* claim. *Id*. at 695. The Court noted that "[a] rule . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id*. at 696. *Banks*, however, addressed a situation in which the prosecution had repeatedly asserted that all *Brady* material was disclosed, but nevertheless continued to conceal such material. In particular, the Court noted that "[e]ach time [a witness] misrepresented his dealings with the police, the prosecution allowed that testimony to stand uncorrected." *Id*. at 672. The Court concluded: "In short, because the State persisted in hiding [the witness's] informant status and misleadingly represented that it had complied in full with its *Brady* disclosure obligations, Banks had cause for failing to investigate, in state post conviction proceedings, [the witness's] connections to [the police]." *Id*. at 693. There is no evidence of such prosecutorial concealment and misrepresentation in Harbison's case, however.[5] At the post-conviction hearing, the police officers did not indicate that the files did not exist or that they would refuse to provide them to Harbison, but rather that they did not know where the files were located. There is no evidence in the record before the district court that those individuals were charged with the task of locating that particular file. Nor has Harbison presented any evidence that would indicate that the files were intentionally concealed.

If Harbison had requested the police files within a reasonable time, he would have had various options for state-court consideration of this claim. Because his post-conviction proceeding was on appeal through 1996, he had the opportunity to move to remand for consideration of new evidence. *See Laney v. State*, 826 S.W.2d 117, 118 (Tenn. 1992). In addition, had he requested the files within a reasonable time, he could have filed a petition for writ of error coram nobis or, prior to 1995, an additional post-conviction petition.[6] By the time Harbison filed the petition for writ of habeas corpus in federal court, however, these opportunities were no longer available to him. Because Harbison has failed to demonstrate cause for his failure to argue this claim before the state courts, this claim may not be considered by this court.

Although Harbison has not demonstrated cause for his failure to pursue these claims in state court, we nevertheless here address the issue of prejudice to Harbison that may be attributed to the withholding of this evidence. Harbison has not demonstrated such prejudice. While the relevant evidence may raise some question about Harrison's potential proximity to the Russell murder and Schreane's motivation in identifying Harbison as the murderer, this evidence is not sufficient to create a reasonable probability that the result of the trial would have been different. The evidence

---

[5] Similarly, the prosecution deliberately withheld material evidence in *Freshwater v. State*, No. W2003-01343-CCA-R3-CO, 2004 WL 1944140, *9 (Tenn. Crim. App. Sept. 1, 2004). In *Freshwater*, the Tennessee Court of Criminal Appeals determined that the "delay in obtaining the [*Brady*] evidence [was] not attributable to the fault of the petitioner or her attorneys," even though the claim was discovered far after Freshwater's conviction. *Id*. Significantly, the *Brady* material in this case was discovered only after Freshwater had escaped from prison and had remained at large for over thirty years. The court noted:

> Indeed, if the State's position in this appeal were to prevail, criminal defendants, in order to protect their rights to file a coram nobis petition, would be required in every case to examine every prosecution file following their convictions in order to determine whether exculpatory evidence was withheld. We cannot believe this is something the State really wants. "[T]he State's finality interest is seriously compromised when the prosecution has suppressed evidence in violation of its constitutional duty and is directly responsible for causing the delay in finality."

*Id*. (quoting *Harris v. State*, 102 S.W.3d 587, 602 (Tenn. 2003) (Anderson, J. dissenting)).

Again, we observe that *Freshwater* involved the intentional concealment of *Brady* material. As previously discussed, there is no evidence of such prosecutorial concealment in Harbison's case.

[6] Prior to the 1995 amendments, petitioners were not limited to only one post-conviction petition.

concerning Harrison reveals that he was initially a suspect in the Russell murder, and this evidence could have been used by Harbison's counsel in an attempt to shift culpability to another individual. However, this evidence, even when considered in combination with allegations regarding Schreane's reasons for identifying Harbison, does not create a reasonable doubt that the trial would have ended differently. The district court meticulously analyzed this evidence and found that it was not a *Brady* violation and it was not material to the defense. We agree. Harbison's confession to the murder is strong evidence of his guilt, which this new evidence was unlikely to overcome.

Although the claim has been procedurally defaulted, and we therefore do not directly reach the merits of this case, the above cause and prejudice discussion parallels requirements for the *Brady* analysis. Because Harbison has not demonstrated such cause and prejudice, he has not established a *Brady* violation.

While we decide the case on procedural default, as did the district court, it makes little sense to discuss in detail the *Brady* issue. Nevertheless, certain explanations may be in order. First, the district court found that even if the alleged claim was not procedurally defaulted, there was no *Brady* violation. Second, the district court found that evidence involving the victim's nefarious activities of buying and selling stolen merchandise was not relevant to the case. Third, on the evidence involving Schreane, the court found that either most of the evidence was admitted at trial, was not material, or was not wholly in the control of the prosecution. As the dissent observes, the district court found that the statement by Schreane that he was angry at Harbison for making romantic overtures to Schreane's girlfriend could not have altered the judgment of the jury, because Schreane did not testify at trial. Finally, concerning the evidence which involved Harrison, it was not material, because Harbison raised an alibi defense and testified that his confession to the crime was false.

We agree with the district court on the merits, but we will further discuss some of these details in our explanation of this ruling. Several assertions in the dissent need to be clarified. First, the dissent states that Charlene Harrison told Detective Foster that her husband was with the Lynns, who lived across the street from the victim, on the day of the murder. That is correct in part, but the full statement was that "she knew Ray did not kill Ms. Russell because he spent all evening with Tommy and Larry Lynn in Ft. Oglethorpe and they returned Saturday night at between 10:30 and 11:00 P.M. on 1-15."[7] Thus, no one put Harrison at the Lynn house on the day of the murder, unlike the admission of Schreane that he smoked marijuana with Linda Lynn in front of the house on the afternoon of the murder.

Second, although Charlene Harrison placed Ray Harrison at the scene of the crime, she said that he was there with at least one other person. This did not help Harbison's alibi, for Harbison and Schreane both could have been with Harrison at the time. She never did identify who the other person or persons were. Moreover, after Boss had told the officers of his conversation with Charlene Harrison on January 19, 1983, the officers sent an unnamed informant with a "tape" to get Charlene Harrison to admit what she had allegedly told Boss, but she did not convey the same information and would not confirm the information previously received. Third, the dissent says that Boss asserted that Harrison was "scared" the morning after the murder. However, there are several reasons why Harrison might be concerned by the interest from the police in searching his residence with a search warrant, because he was involved in drug trafficking and was wanted by the authorities in Florida, where he was eventually arrested. In fact, Harrison allegedly told Boss that when he

---

[7] The dissent suggests that this put Harrison "in close proximity to the Russell home at the time of Edith Russell's murder, which took place at some point before midnight." That depends entirely upon whether Mrs. Russell was killed near midnight, which is not a logical conclusion from the record. More likely, she was killed in the afternoon, sometime after 2:45 p.m. Two witnesses testified that they had tried to call Mrs. Russell at 5:30 p.m., 6:30 p.m. and 8:30 p.m. without an answer on the day of the murder.

found the police were coming with a search warrant, he went over to his mother's apartment and got rid of "some pills."

Finally, the dissent suggests that Harbison could have used Schreane's jailhouse statement on cross examination of Detective Foster, as to whether the police pursued an investigation of Harrison in light of Schreane's motive to falsely implicate Harbison. There is a question as to the admissibility of that statement, but even if admissible, there was some detailed investigation in the Harrison files between January 16-31, 1983. Apparently, it was not until February 17, 1983, when the detectives first learned that Schreane had told Omenys West that Harbison had killed Russell. Later that day, Schreane admitted that he had been at the Russell house with Harbison on the day of the murder. Thereafter, the police found some of the stolen items in the custody of Harbison's girlfriend, Schreane led police to the stolen TV set and to the murder weapon, and Harbison finally confessed to hitting Mrs. Russell twice with the vase.

## C.     Appellate Counsel's Conflict of Interest

Harbison claims that Strong, his appellate counsel, suffered from a conflict of interest because he had previously represented Harrison, who was initially a suspect in the Russell murder. As a result, Harbison argues, Strong was unable to make arguments that would support Harbison's assertions that he had not committed the crime. He alleges that, had Strong not been burdened by this conflict and had he been aware of the evidence concerning Harrison in the police files, Strong would have been able to make the argument that Harrison had opportunity and motive to commit the crime. This claim also was not introduced before the state courts until after the district court denied Harbison's petition. As a result, much of the above procedural default analysis is relevant to this claim. Harbison has failed to demonstrate cause for his failure to assert this claim until his petition to the district court.

Again, although Harbison has not demonstrated cause for his failure to pursue these claims in state court, we nevertheless address the issue of prejudice to Harbison that may be attributable to his counsel's alleged conflict. Harbison has not demonstrated such prejudice. A possibility of conflict is insufficient to establish a violation of Harbison's Sixth Amendment rights, and no violation occurs where the conflict is irrelevant or merely hypothetical. *See Moss v. United States*, 323 F.3d 445, 463-64 (6th Cir. 2003). Harbison argues that Strong rendered ineffective assistance by not raising certain issues involving Harrison's potential involvement in Russell's death. Relying on the new evidence discussed in his *Brady* claim, Harbison asserts that Strong failed to pursue and present evidence concerning Harrison that could have created doubt about Harbison's guilt. However, as noted above, the new evidence presented concerning Harrison was unlikely to change the result of Harbison's trial. Furthermore, Harbison has presented no facts to demonstrate that Strong was aware of the additional evidence concerning Harrison and that he decided not to present the additional evidence due to his representation of Harrison. Finally, the fact that Strong represented Harbison during his motion for a new trial and on direct appeal, rather than during the trial, would reduce the danger posed by any conflict. Harbison has not cited any specific instances in the record where his interests were impaired by Strong's prior representation of Harrison.

## IV.     MATTERS OUTSIDE THE RECORD

The dissent has referenced matters which are not part of the record on review, as they are records from the second state post-conviction review held subsequent to the judgment by the district court herein. Inasmuch as we denied Harbison leave to supplement the record to provide the second post-convictions materials, it would not be appropriate for us to comment about those matters. This case is on appeal from the district court, which did not have any of those subsequent materials before it. "We cannot consider a report that is not part of the record." *United States v. Bonds*, 12 F.3d 540, 552 (6th Cir. 1993). *But see Thompson v. Bell*, 373 F.3d 688, 691 (6th Cir. 2004) (allowing record

on appeal to be supplemented under "our equitable power"), *cert. granted on other grounds*, 125 S.Ct. 823 (2005).

Similarly, the dissent quotes from a subpoena directed to Wilhoit to bring with him to the post-conviction hearing "[a]ny and all records, files or documents in his possession or in the possession of the Chattanooga Police Department relative to the case of State of Tennessee v. Edward Jerome Harbison, Jr." That also is not in the record from the district court, nor was it mentioned in Harbison's briefs to this court. Additionally, Harbison did not ask to supplement the record with that document under Federal Rule of Appellate Procedure 10(e). Therefore, it would also not be appropriate to comment about that subpoena.

## V.    CONCLUSION

For the foregoing reasons, the judgment of the district court denying the writ is AFFIRMED.

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, dissenting.  I dissent because the district court should have granted Harbison's petition for a writ of habeas corpus on the ground that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963).  Harbison has shown cause and actual prejudice for his failure to raise his *Brady* claim in state court prior to seeking habeas relief in federal court.

## I.
### *Brady* Violation

Harbison's trial counsel filed several pre-trial motions for discovery, requesting exculpatory information and witness statements.  *See* J.A. 24 (motion for discovery of documents "which are material to the preparation of the defense"); J.A. 26 (motion  for order compelling "the State to furnish [Harbison] with any and all exculpatory evidence of which the State, its agents, employees, attorney generals and law enforcement officials have knowledge that may tend to exonerate defendant of the charge or may mitigate any punishment for him"); J.A. 28 (motion to compel disclosure of *Brady* materials relevant to sentencing).  Despite several court orders compelling disclosure of these materials, the State did not produce evidence contained in Chattanooga Police Department records favorable to the defense.

Excerpts from the undisclosed files of Detective Larry Foster, the officer principally responsible for investigating Edith Russell's murder, indicate that Ray Harrison had a motive to burglarize and/or murder Edith Russell.  Ray Harrison told Detective Foster that he had tried to sell Russell a ring the previous week, but that she did not buy it.  (J.A. 918.)  Harrison's cousin, Benny Goins, confirmed that he had given a ring to Ray Harrison a week before Russell's death and that Harrison was supposed to sell the ring for him.  (J.A. 961-62.)  Ray Harrison's wife, Charlene, told Detective Foster that Russell had taken the ring to a jeweler for an appraisal and purportedly determined that it contained a fake diamond.  (J.A. 1077.)  Detective Foster's interview with Ray Harrison's brother-in-law indicated that "Ray Harrison and Benny Goins were mad at Edith Russell because they believed that she had 'switched rings on Ray.'"  (J.A. 978.)

Other entries in Detective Foster's file suggest that  Ray Harrison and David Schreane (who participated in the robbery of Russell's home) were together on the day of the murder and in close proximity to the Russell residence.  Charlene Harrison told Detective Foster that her husband was with the Lynns, Russell's across-the-street neighbors, on the day of the murder.  (J.A. 1077.)  In addition, David Schreane admitted that he smoked marijuana with Linda Lynn in front of the Lynns' house during the afternoon of the murder.  (J.A. 976.)

The majority discounts this evidence because "no one put Harrison at the Lynn house on the day of the murder." Slip Op. at 10.  As support, the majority quotes Charlene Harrison's statement to Detective Foster that Harrison had "'spent all evening with Tommy and Larry Lynn in Ft. Oglethorpe and they returned Saturday night at between 10:30 and 11:00 P.M. on 1-15.'"  *Id.* (quoting J.A. 1077).  It is true that Charlene Harrison's statement does not necessarily place her husband at the Lynns' house, but the jury could have inferred this fact from her statement. Significantly, she did not tell Detective Foster that her husband "returned *to her house*" between 10:30 and 11:00 p.m., only that her husband and the Lynns "returned" between those times. Charlene Harrison could have meant that they returned to the Lynns' house by 10:30 or 11:00 p.m. According to the Tennessee Supreme Court, Edith Russell's husband discovered her dead body at midnight. *State v. Harbison*, 704 S.W.2d 314, 315 (Tenn. 1986).  Therefore, the undisclosed *Brady*

material reasonably could suggest that Harrison was in close proximity to the Russell home at the time of Edith Russell's murder, which took place at some point before midnight.

In asserting that the possibility that Russell was murdered near midnight "is not a logical conclusion from the record," Slip Op. at 10 n.7, the majority inappropriately assumes the role of factfinder and denies that the jury which actually convicted Harbison and sentenced him to death would have been permitted to find to the contrary. Because, as the majority notes, there is nothing in the record that indicates a precise time of death, Maj. Op. at 2, Harbison was entitled to present the undisclosed evidence to a jury in a light most favorable to him.

Ultimately, the majority's view about Russell's time of death is irrelevant because other undisclosed evidence actually places Harrison at the scene of her murder. David Boss told Detective Foster that Charlene Harrison had told him that Ray Harrison was actually inside Edith Russell's house on the night of the murder with another person. (J.A. 921-23.) She also told Boss that Ray Harrison did not kill Russell, but that when Russell entered her house, "they" (including Harrison) ran away. *Id.* Boss's statement certainly would support a defense theory that Harrison not only had the motive and opportunity to murder Russell, but actually participated in that crime, thereby potentially shifting blame away from Harbison.

The majority argues that this evidence would not have assisted Harbison's alibi defense because Charlene Harrison's reference to "they" is consistent with the possibility that both Schreane *and* Harbison were with Harrison at the time of the murder. Slip Op. at 10. Although the majority's characterization of this statement is plausible, Harbison should have been afforded the opportunity to present an equally plausible and reasonable alternative to the jury that supported his alibi defense: that only Harrison and Schreane were present at Edith Russell's murder.

Boss also told Detective Foster that he saw Ray Harrison on the morning after the murder and observed him to be "a little scared and shaky" and "scared to death." (J.A. 926.) Harrison asked Boss "if the polices [sic] had been there" and said "that they were comin' back with a search warrant." *Id.* Moreover, Harrison's brother-in-law told Detective Foster that Charlene Harrison was concerned because she could not locate the jacket Ray Harrison had been wearing on the night of the murder. (J.A. 978-79.)

True to form, the majority discounts this *Brady* material by insisting that there is only one plausible view of the evidence. The majority speculates as to "several reasons why Harrison might be concerned by the interest from the police in searching his residence with a search warrant." Slip Op. at 10-11. Although the majority's explanations are plausible, it is equally plausible that Harrison was scared to death because he had murdered Edith Russell the night before and was deeply concerned about the police apprehending him.

Finally, an undisclosed excerpt from Detective Foster's file suggests that David Schreane falsely implicated Harbison in Russell's murder. A witness named Omenys West told Detective Foster that he knew David Schreane because he used to commit burglaries with him in the St. Elmo area, where Edith Russell lived. (J.A. 1010.) Subsequent to the murder, West and Schreane happened to be in the same courthouse cell with regard to their respective burglary charges. (J.A. 1011.) At that time, Schreane told West that he had been committing burglaries in the St. Elmo area. (J.A. 1011-12.) Later, Schreane told West that he was upset that his brother-in-law (Harbison) "had been tryin' to talk to his old lady, and that his brother-in-law was the one that killed the woman out there on, in St. Elmo." (J.A. 1012.) West reiterated to Detective Foster that Schreane had told him that Harbison had killed "that bitch in St. Elmo," namely Edith Russell. (J.A. 1016-17.) In a summary of his interview of West, however, Detective Foster stated that Schreane had told West that Schreane's "brother-in-law [Harbison] was messing with his girlfriend and if he did not stop Schreane said he would put the murder in St. Elmo on him." (J.A. 1082.)

The district court discounted Schreane's jailhouse statement because Schreane did not testify at Harbison's trial and, therefore, Schreane's statement could not have been used to impeach him. It is conceivable, however, that Harbison could have used Schreane's statement on cross-examination of Detective Foster, who was principally responsible for investigating Russell's murder. Harbison could have asked the detective whether and to what extent the police pursued an investigation of Ray Harrison in light of Schreane's motive to falsely implicate Harbison in the murder. Such cross-examination had the potential of undermining the prosecutor's argument that the police had conducted a thorough investigation for all possible suspects in the murder. *See* J.A. 1676-77. Armed with knowledge that Harrison was a legitimate suspect in the murder, Harbison likely would have altered his trial strategy. In addition to attempting to establish an alibi defense and arguing that his confession had been coerced by police threats to take away his girlfriend's children, he could have introduced additional evidence shifting blame for the murder to Harrison. This possibility undermines confidence in Harbison's guilty verdict.

According to *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused …violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; *see also Strickler v. Greene*, 527 U.S. 263, 288 (1999) ("[U]nder *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment."). Favorable evidence is material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). However, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The *Brady* rule "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler*, 527 U.S. at 280-81 (quoting *Kyles*, 514 U.S. at 438). The rule applies only to evidence discovered after trial that was unknown to the defense at the time of trial. *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir .1994) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)). The prosecutor has a duty to disclose *Brady* material even when the accused does not specifically request it, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and the duty encompasses impeachment evidence as well as exculpatory evidence, *Bagley*, 473 U.S. at 676. "In order to comply with *Brady*, … 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Strickler*, 527 U.S. at 281 (quoting *Kyles,* 514 U.S. at 437).

Based on these principles, I would hold that the non-disclosure of the above-referenced portions of Detective Foster's file undermines confidence in Harbison's guilty verdict because, viewed in its entirety, this evidence could have formed the foundation of a colorable defense that Ray Harrison, not Harbison, murdered Edith Russell and that Schreane falsely implicated Harbison out of jealousy. *See Kyles*, 514 U.S. at 436 (holding that the determination of whether undisclosed evidence is "material" requires the reviewing court to determine the suppressed evidence "collectively, not item by item"). Ray Harrison's wife placed Harrison at the scene of the crime, thereby buttressing Harbison's alibi defense to the murder charge. The fact that a witness told police that Harrison was "scared to death," apparently because he expected the police to search his house, lends significant support to the theory that Harrison was involved in Russell's murder. The additional fact that Schreane had a motive to falsely link Harbison to Russell's murder solidifies the conclusion that there is a reasonable probability that Harbison would have been able to shift blame for the murder from himself had the police records been disclosed to him.

Harbison might have been found guilty even if he had been able to present this suppressed evidence to the jury. But it is not his burden to demonstrate that presentation of the suppressed

evidence would have led to his acquittal. *See Id.* at 434-35 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."). Harbison need only show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Here, Harbison reasonably could have used the suppressed evidence to shift blame for the murder to Harrison. Although, as the majority points out, the prosecution would have been able to marshal plausible responses to such evidence, Harbison at least had the right to present his best possible defense to the jury. The prosecution's *Brady* violation denied Harbison that right.

## II.
### Cause and Prejudice Excuses Any Procedural Default

The majority holds that Harbison procedurally defaulted his *Brady* claim. Harbison may avoid any procedural default, however, "by showing that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case." *Lancaster v. Adams*, 324 F.3d 423, 436 (6th Cir. 2003) (internal quotation marks and citation omitted). "Cause is shown when the factual basis of the claim was 'reasonably unknown' to the defendant's counsel." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002) (quoting *Amadeo v. Zant*, 486 U.S. 214, 222 (1988)). Harbison has made just such a showing.

### A.     Cause

Harbison's trial counsel made at least three separate requests for exculpatory information, which the trial court granted, but the prosecutor did not produce the portions of Detective Foster's file discussed above. Harbison's trial counsel could not have obtained the file records directly from the Chattanooga Police Department because, at the time of trial in 1983, the documents were exempt from disclosure under state public records law. Tenn. Code Ann. §§ 10-7-101 et seq. At Harbison's state post-conviction hearing in 1991, it was established that Harbison's post-conviction counsel had subpoenaed Detective Foster's file from the Chattanooga Police Department. The transcript of the hearing further indicates that, in response to the request, Detective Clyde L. Wilhoit had attempted to locate Detective Foster's file, but that Wilhoit had no information regarding its location and, therefore, did not bring it to court. (J.A. 1778-79.)

The majority dismisses Wilhoit's testimony, concluding that Wilhoit stated only that he was unaware of the location of Detective Foster's file, not that any individual at the police department had been charged with the task of locating that particular file. *See* Slip Op. at 9. This is patently untrue. Because Detective Foster was deceased by the time of Harbison's post-conviction hearing in 1991, Harbison subpoenaed Wilhoit, who had assisted Foster in the investigation of Edith Russell's murder. The subpoena commanded Wilhoit to bring with him to the post-conviction hearing "[a]ny and all records, files or documents in his possession or in the possession of the Chattanooga Police Department relative to the cause of State of Tennessee v. Edward Jerome Harbison, Jr." Thus, on pain of contempt, Wilhoit was charged with the task of making a diligent search of the Chattanooga Police Department's records for that file. The clear import of Wilhoit's sworn testimony that he could not locate Detective Foster's file was that, as far as the Chattanooga Police Department was concerned, Detective Foster's file on the Edith Russell murder was lost.

The post-conviction testimony of former Chief Detective James M. Davis from 1991 does not prove otherwise. Although Davis insisted that Detective Foster's file was still at the police department, he further testified that he had left the department in 1983, eight years before he testified at Harbison's post-conviction hearing. Accordingly, his bald assertion that Detective Foster's file still existed in 1991 was utterly without foundation. Nevertheless, the majority credits Davis's speculations over that of a current employee of the police department (Wilhoit), who was charged

with the task of locating the file in 1991 but could not locate it at that time, and reaches the remarkable conclusion that Wilhoit's and Davis's testimony shows that "there was a very strong possibility that the relevant files would be available if requested through the appropriate channels." Slip Op. at 8. I cannot fathom how the majority reaches this conclusion when Harbison's subpoena ducus tecum (clearly an "appropriate channel[]") failed to yield these files.

The majority dismisses the significance of the Wilhoit subpoena because it "is not in the record from the district court, nor was it mentioned in Harbison's brief to this court." Slip Op. at 12. It is the majority, however, who has made the Wilhoit subpoena an issue in this case. The majority asserts that there is no evidence in the district court record that any individuals at the Chattanooga Police Department "were charged with the task of locating" Detective Foster's file. *Id.* at 9. Warden Bell, however, never advanced this position in support of his procedural default argument in the district court, nor has he presented it to this Court. *See Respondent's Br.* at 32-22, 40 (arguing that Harbison procedurally defaulted his *Brady* claim because he could have made a public records request for Detective Foster's file). The majority's assertion is a new argument, raised for the first time today. Harbison had no way of knowing that the Wilhoit subpoena would be relevant and that he therefore should have introduced it in the district court or included it in the Joint Appendix.

"Because this court sits to decide real cases, not abstract questions of law, and because an adequate understanding of a case is essential to our decision," *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980), the Court should fully examine the record in Harbison's state post-conviction proceeding and take judicial notice of the Wilhoit subpoena. *See id.* ("'Federal courts may take judicial notice of proceedings in other courts of record.'") (quoting *Granader v. Pub. Bank*, 417 F.2d 75, 82-83 (6th Cir. 1969)). Alternatively, this Court can and should supplement the record under our equitable power, even though the district court apparently did not consider the Wilhoit subpoena. *See Thompson v. Bell*, 373 F.3d 688, 690-91 (6th Cir. 2004) (invoking the Court's "inherent equitable powers to expand the record on appeal" even though the evidence was not made part of the district court record), *cert. granted on other grounds*, __ U.S. __, 125 S. Ct. 823 (2005). The interests of justice require this Court to consider the Wilhoit subpoena in order to assess the merits of the majority's argument that Harbison has failed to present evidence that anyone at the Chattanooga Police Department was ever charged with the task of locating Detective Foster's file.

A fair reading of the available record in this case demonstrates that Harbison did not procedurally default his *Brady* claim. The Supreme Court's decision in *Strickler* is instructive. There, the State gave the petitioner access to all of the evidence in the prosecutor's files, such that petitioner's counsel did not file a pretrial motion for discovery of possible exculpatory evidence. *Strickler*, 527 U.S. at 276. The prosecutor (probably unintentionally) failed to disclose notes taken by a detective during interviews with an eyewitness as well as letters written by the eyewitness to the detective. *Id.* at 273-75. After the defendant was convicted and his conviction was affirmed in the state courts, he filed a federal habeas action wherein he was granted the right to examine and copy all of the police and prosecution files in the case. *Id.* at 278. When the petitioner discovered the undisclosed notes and letters, he raised a *Brady* claim for the first time. *Id.*

The Supreme Court held there was cause for the petitioner's failure to raise his *Brady* claim in state court because it was reasonable for both trial and post-conviction counsel "to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for examination." *Id.* at 284. The respondent argued that the fact that the district court entered an order allowing discovery of the undisclosed police files indicated that "diligent counsel could have obtained a similar order from the state court." *Id.* at 284-85. The Court rejected this argument because petitioner's counsel had every reason to believe that the State had discharged its *Brady* obligations at trial through its open file policy. *Id.* at 288. Mere speculation

that some exculpatory material may have been withheld did not "suffice to impose a duty on counsel to advance a claim for which they ha[d] no evidentiary support." *Id.* at 286. As the Court elaborated:

> Proper respect for state procedures counsels against a requirement that all possible claims be raised in state collateral proceedings, even when no known facts support them. The presumption, well established by "'tradition and experience,'" that prosecutors have fully "'discharged their official duties,'" *United States v. Mezzanatto*, 513 U.S. 196, 210, 115 S. Ct. 797, 130 L. Ed.2d 697 (1995), is inconsistent with the novel suggestion that conscientious defense counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred.

*Id.* at 286-87.

As in *Strickler*, Harbison filed numerous discovery motions for *Brady* materials, all of which were granted. Harbison's counsel was entitled to rely on not only the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials (including Detective Foster's complete file) would be included in the evidence actually tendered to defense counsel for examination. The State violated *Brady* when the prosecutor failed to disclose all of Detective Foster's files to Harbison in 1983.

Warden Bell appears to concede as much, but argues that, as of January 29, 1992, Harbison had an alternative means of obtaining Detective Foster's file. While Harbison's case was on appeal from the denial of state post-conviction relief, the Tennessee Court of Appeals held that police records become public records that are open for disclosure upon conclusion of the direct appeal, and convicted felons (although prohibited from obtaining public records themselves) can obtain them through counsel. *See Capital Case Resource Ctr. of Tenn., Inc. v. Woodall*, No. 01-A-019104CH00150, 1992 WL 12217 (Tenn. Ct. App. Jan. 29, 1992) (holding that the District Attorney General could not deny a request for access to the prosecution and police files on a rape/murder case by attorneys representing the person convicted of the crimes in a pending habeas corpus proceeding in federal court because such files were not exempt from disclosure under the Tennessee Public Records Act, TENN. CODE ANN. §§ 10-7-101, *et seq.*); *Wright v. State*, 987 S.W.2d 26, 29 (Tenn. 1999) (agreeing that the date of the decision in *Woodall* was the relevant date for purposes of determining when the petitioner should have first become aware of his right to access public records that previously had been exempt from disclosure). Warden Bell argues (and the majority agrees) that by waiting until his federal habeas action in 1997 to make a public records request to the Chattanooga Police Department, Harbison simply waited too long (five years) to obtain the evidence that underpins his *Brady* claim.

Warden Bell's reasoning is flawed for the same reasons advanced by the respondent in *Strickler*. Warden Bell assumes that Harbison had a factual basis to make a public records request for Detective Foster's files during that five-year period. He clearly did not. First, Harbison's trial and post-trial counsel were entitled to rely on the presumption that the prosecutor had produced all *Brady* material in response to Harbison's pre-trial discovery requests. Second, as discussed above, Harbison's postconviction counsel made a request for *Brady* material, and Detective Foster's file in particular, in 1991, but was told by the officer purportedly in charge of the file (and testifying under oath) that it could not be located. Thus, Harbison had no basis to make a further public records request after 1991. *Cf. Strickler*, 527 U.S. at 286 (holding that mere speculation that the files could now be located did not "suffice to impose a duty on counsel to advance a claim for which they ha[d] no evidentiary support").

In any event, although not technically part of the record on review,[1] it is undisputed that in 1995 Harbison's counsel directed a second public records request for *Brady* materials to both the Chattanooga Police Department Police Chief and the Chief's second in command. *See Attachment "C" to Harbison's May 11, 2004 Mot. to Supplement the Record* at 104-05. No records were produced in response. *Id.* at 106. Moreover, Harbison's counsel followed up the record requests with a telephone call to Stanley Lanzo of the District Attorney's Office, who informed counsel that there were no records other than what had already been produced. *Id.* The *reality-based* facts therefore show that there was at most a two-year delay between Harbison's last request for the *Brady* material and the request he made after filing his habeas action in federal court. And, given that the State had told Harbison (a) implicitly in 1983 that he had all *Brady* material, (b) explicitly in 1991 that potential *Brady* material could not be located, and (c) explicitly in 1995 there was no other *Brady* material, there clearly is cause for Harbison's failure to discover the factual basis of his *Brady* claim until 1997.

In holding that Harbison failed to demonstrate cause for his procedural default, the majority ignores the similarity between this case and the facts in *Strickler* and instead relies upon the Supreme Court's decision in *Banks v. Dretke*, 540 U.S. 668 (2004). Although the majority correctly notes that *Banks* involved instances of egregious prosecutorial concealment of *Brady* evidence and intentional misrepresentation, the merits of Harbison's *Brady* claim do not hinge on whether his prosecutors intentionally or deliberately withheld *Brady* evidence. *See Strickler*, 527 U.S. at 282 (holding that one component of a *Brady* violation is that the evidence was "suppressed by the State, either willfully *or inadvertently*") (emphasis added); *id.* at 288 ("[U]nder *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment."). "'If the suppression of the evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Id.* (quoting *Agurs*, 427 U.S. at 110). Consistently, the "cause" inquiry in *Brady* cases "turns on events or circumstances 'external to the defense.'" *Banks*, 540 U.S. at 696 (quoting *Amadeo v. Zant*, 486 U.S. 214, 222 (1988) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986))). A State's inadvertent suppression of *Brady* material is no less external to the defense than a willful one. Indeed, in *Strickler*, the fact that the prosecutor's failure to disclose *Brady* material was inadvertent, *see Strickler*, 527 U.S. at 275 n.12, did not preclude the Court from finding cause for the procedural default, *see id.* at 289. Here, Harbison's counsel reasonably relied on the State's implicit and explicit representations that there was either no other *Brady* evidence to discover or that requesting further discovery of such material would be futile. Accordingly, there was cause for his procedural default, notwithstanding the purported lack of evidence of deliberate prosecutorial concealment.

The majority makes the same fundamental error in attempting to distinguish *Freshwater v. State*, No. W2003-01343-CCA-R3-CO, 2004 Tenn. Crim. App. LEXIS 741 (Tenn. Crim. App. Sep. 1, 2004). There, the petitioner, Margo Freshwater, had been tried and convicted of first degree murder in 1969. *Id.* at *1. At trial, Freshwater's attorney requested the written statement of any informer, but the prosecution produced only portions of these statements. *Id.* at *7. Less than a

---

[1] By order of August 6, 2004, this panel (with Clay, J., dissenting) unjustifiably denied Harbison leave to supplement the record in order to provide additional information regarding the exhaustion of his *Brady* claim in state court. *Harbison v. Bell*, No. 02-5392 (6th Cir. Aug. 6, 2004). It is clear from the attachments to that motion that Harbison did eventually present his *Brady* claim to the Tennessee courts. On June 26, 2001, Harbison filed a motion to re-open his petition for post-conviction relief and a writ for error coram nobis with the Criminal Court of Hamilton County and requested a stay of the appeal pending the state court's decision. The motion/petition raised seven issues, including the *Brady* issue. The Criminal Court held an evidentiary hearing on Harbison's claims on October 13, 2003. *See Attachment "C" to Harbison's May 11, 2004 Mot. to Supplement the Record.* On March 30, 2004, the state court dismissed Harbison's motion to re-open pursuant to *Harris v. State*, 102 S.W.3d 587 (Tenn. 2003) (holding that a petition for a writ of error coram nobis, and not a motion to reopen, is the proper proceeding through which to seek review of newly discovered evidence), and dismissed his petition for a writ of error coram nobis as time-barred. *See Attachment "A".*

year after her conviction was affirmed on direct appeal, Freshwater escaped from prison and remained at large until 2002. *Id.* at *6. In September 2002, Freshwater's counsel discovered the informer's complete statement during a review of the District Attorney's case file. *Id.* at *8, *19. In 2003, Freshwater filed a petition for a writ of error coram nobis, alleging that new evidence existed that proved her innocence, as well as complaining of a *Brady* violation. *Id.* at *1. The State moved to dismiss based on the one-year statute of limitations. *Id.* at *9. The State argued that the petitioner was at fault for failing to bring the *Brady* claim sooner because she had been a fugitive for 33 years. *Id.* at *25.

The court disagreed with the State's argument and held that the delay in obtaining the evidence was not attributable to the fault of the petitioner or her attorneys. *Id.* at *26. The court explained:

> Despite the fact that the petitioner escaped from prison and remained at large for over thirty years, the petitioner's trial counsel specifically requested the written statement of "any informer once held in the DeSoto County [Mississippi] Jail" as part of a discovery request. That information was not provided to the petitioner at trial. The fact that the petitioner escaped from jail and remained a fugitive for many years does not change the fact that the evidence was withheld by the State. Even if the petitioner had not escaped we have no reason to believe this evidence would have been disclosed voluntarily. Indeed, if the State's position in this appeal were to prevail, criminal defendants, in order to protect their rights to file a coram nobis petition, would be required in every case to examine every prosecution file following their convictions in order to determine whether exculpatory evidence was withheld. We cannot believe this is something the State really wants.

*Id.* The court therefore held that due process precluded the dismissal of Freshwater's *Brady* claim based upon a statutory time bar. *Id.* at *27.

As was the case in *Freshwater*, Harbison's trial attorneys requested the exculpatory information contained in the police records, but the State did not produce them for another 14 years. The State's nondisclosure was just as deliberate as the nondisclosure in *Freshwater*. In fact, the non-disclosure was more deliberate in Harbison's case; for when post-conviction counsel requested the police records in 1991, he was told that the records could not be located, and after his request in 1995, was informed that nothing was available beyond what already had been produced. If Freshwater, who waited 32 years before making a postconviction request for *Brady* information because she was a fugitive, had cause for her procedural default, then it follows, *a fortiori*, that Harbison, who made at least two additional requests for *Brady* material and was told that no such information could be located or existed, did not have to make what reasonably would have appeared to be a third futile request in order to establish cause.

**B.      Prejudice from Non-Disclosure of Police Records**

For the reasons discussed in Part I, *supra*, I would hold that the evidence contained in Detective Foster's file denied Harbison a fair trial and demonstrates that his guilty verdict is unworthy of confidence. Accordingly, I would hold that Harbison satisfied the prejudice prong of the procedural default analysis and that the district court should have granted Harbison a writ of habeas corpus on his *Brady* claim.

### III.
### Conclusion

For all the foregoing reasons, I dissent.