*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

STEPHEN M. BELL,

　　　　　　　　*Petitioner-Appellant,*

　　　　*v.*

RICKY BELL, Warden,

　　　　　　　　*Respondent-Appellee.*

No. 04-5523

>

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 95-00600—William J. Haynes, Jr., District Judge.

Argued: June 6, 2007

Decided and Filed: January 4, 2008

Before: BOGGS, Chief Judge; MARTIN, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, and GRIFFIN, Circuit Judges.

---

**COUNSEL**

---

**ARGUED:** Gretchen L. Swift, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Joseph F. Whalen III, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Gretchen L. Swift, Jude T. Lenahan, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Joseph F. Whalen III, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

　　　　GIBBONS, J., delivered the opinion of the court, in which BOGGS, C. J., BATCHELDER, ROGERS, SUTTON, COOK, McKEAGUE, and GRIFFIN, JJ., joined. CLAY, J. (pp. 13-24), delivered a separate dissenting opinion, in which MARTIN, MOORE, COLE, and GILMAN, JJ., joined, with MOORE, J. (p. 25), also delivering a separate dissenting opinion, in which MARTIN, COLE, and CLAY, JJ., joined. DAUGHTREY, J. (p. 26), delivered a separate opinion dissenting in part and concurring in part.

JULIA SMITH GIBBONS, Circuit Judge.  Petitioner-appellant Stephen Michael Bell[1] was convicted in Tennessee state court of one count of first degree murder and one count of second degree murder.  After unsuccessfully pursuing relief in the Tennessee appellate courts, Bell sought a writ of *habeas corpus* in federal district court.  The district court denied Bell's petition but issued a certificate of appealability as to Bell's claims that the prosecution in his case violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over impeachment material and that he received ineffective assistance of counsel.  Bell appealed, and a divided panel of our court reversed the district court as to Bell's *Brady* claim.  *Bell v. Bell*, 460 F.3d 739 (6th Cir. 2006).  A majority of the active members of the court voted for rehearing *en banc*, vacating the original panel decision.

For the reasons below, we affirm the decision of the district court denying Bell *habeas* relief.

I.

The Tennessee Court of Criminal Appeals set forth the facts underlying Bell's conviction:

The victims, Herman Harrison Wallace, a/k/a Mad Dog, and his wife, Jean Lynn Wallace, were street people who camped under the bridges along the Cumberland River.  The defendant, Michael Bell, a/k/a Monk, a street person, camped between the Wallaces and Nashville's Riverfront Park.

Ronald Harrington, a street person, met the defendant on the railroad tracks near the camp sites on September 6, at approximately 3:00 p.m. Defendant was shirtless, wearing Levi's, a pair of shoes or boots and had a gun in his hand.  Chained to his belt, was a billfold similar to that carried by truck drivers.  The gun was either a .32 or .38 caliber revolver.  Defendant appeared to be under the influence and stated that he had been "coking[."]  During this exchange the defendant asked Mr. and Mrs. Harrington to take care of his dog if anything happened to him.

Edward Stansbury, an admitted alcoholic, testified that he spent the night of September 5, 1986, with friends on the river.  The next morning he left but returned to the camp of Gary Hedges in the afternoon.  At approximately 4:30 p.m. they noticed a man come up a path with a shiny black dog on a leash.  The leash was a choker chain with a leather belt.  When the man got to within twenty feet he spoke identifying himself as "Monk" and inquiring if "Mad Dog" and Jean were home.  He walked down to the Wallaces' tent and entered.  Up to this point he, Stansbury, had no reason to commit to memory the man's clothing or facial features.

As Stansbury and Hedges continued to sit they heard the sounds of dogs fighting and people arguing in the Wallaces' camp, then they heard a muffled shot.  Jean Wallace ran out of the tent screaming "He has killed my dog, he has killed my dog[."]  She turned and re-entered the tent.  Stansbury heard a distinctive gun shot and saw Jean Wallace backing out of the tent.  As she cleared the entrance she fell and there were two more shots.  He was sure he had seen the man fire the last shot.  The man had been right behind Mrs. Wallace at the entrance.  The man left the tent and left the scene. As the man was leaving he attempted to reload his pistol.

Stansbury described the culprit as 6'2" or 6'1", lanky, wearing fairly new blue jeans, a black baseball cap over his eyes, a sleeveless Levi jacket and T-shirt.  His arms were tattooed.  He had a billfold with a chain which appeared attached to a belt loop.

---

[1]Because petitioner and respondent share the same last name, we refer to petitioner as "Bell" and respondent as "the Warden."

At a line-up conducted near the crime scene in the fading evening light, Stansbury was hesitant to identify the man in the number two spot. He was certain as to the man's jeans and nearby dog. While testifying he said he was still confused about the man's beard; he thought the culprit had short dark hair, but everything else about the number two man, the defendant, "fit to a tee[."]

Robert Moore, a Metropolitan Police Department homicide officer, arrived at the Wallaces' camp. He viewed the body of Mrs. Wallace and was directed to four shell casings that were lying on the ground. The soil in the area was fairly loose and the shell casings, covered with a chalky gray substance, were on top of the soil. Upon closer examination he was able to detect the smell of gun powder.

Officer Moore was advised that Mr. Wallace had been moved to General Hospital and although he appeared to have been shot as many as three times, only one slug had been found at the hospital. The officers at the crime scene made an extensive search and were able to recover a slug from the bloody mattress within the tent where Mr. Wallace had lain when shot.

After talking with Hedges and Stansbury and getting a general description of the suspect, the officers broadcasted a pick-up. Other detectives took the defendant in[to] custody and returned him to an area near the crime scene. Due to the fading light in and around the camp sites and under the bridges, other officers were setting up a line-up of street type people in an open area nearby. Officer Moore explained that facial identification was not that strong at the crime scene, but clothing details and the overall characteristics of the participants were strong in the witnesses' minds.

Officer Mark Wynn and two other officers responded to a call that a man fitting the description of the suspect was believed to be in the area of Fessler's Lane and Hermitage Avenue. They observed the suspect sitting on the curb and drinking a beer. He had a dog with him. He was taken in[to] custody and found to have six unspent .38 caliber Special Winchester 158 grain bullets in his pants pockets, but no weapon was found. He was concerned about the dog so the officers agreed to transport the dog to the place of the line-up. (A picture of the dog wearing the choke chain and belt leash was shown the jury.)

Sergeant Tommy Jacobs testified that shortly after 5:30 p.m., September 6, 1986, he visited the camp site of the defendant and recovered eleven spent .38 caliber shell casings and a Winchester ammunition box that were lying on the ground. A holster was also recovered at the camp site. Later at the police station Sergeant Jacobs read the defendant his Miranda rights. When told he would be charged with murder, the defendant responded that he had not shot anyone, had not shot a gun and had never shot a gun.

Officer Darryl Ryan performed a nitric acid test on the defendant's hands. The swabs were sent to the crime laboratory.

Officer Archie Spain was sent to General Hospital. He took possession of a .38 caliber slug that was laying beside Mr. Wallace's body in the emergency room.

The State introduced testimony from three laboratory technicians. The first technician had examined the defendant's clothing for blood stains but found none. The second technician, a criminalist, had examined the swabs from the defendant's hands for gunshot residue. This technician testified that "antimonium, barium and lead indicative of gunshot residue was found in significant concentrations on exhibit

5, hand swabs. These results indicate that the subject could have fired or handled a gun."

The third technician was a firearm examiner. He identified the two lead slugs filed earlier as exhibits as being fired from the same firearm. He had disassembled one of the live cartridges taken from the defendant's pockets to compare the lead to the other lead slugs. He was of the opinion the three were from the same manufacturer. The eleven spent shells taken from defendant's camp site were compared with the four spent shells recovered at the victims' camp site. Based upon his microscopic examination he was of the opinion they all had been fired from the same firearm.

The medical examiner testified in detail as to two gunshot wounds found upon Jean Wallace's body. In his opinion either one of these would have caused her death. From his examination of Herman Wallace, he concluded that death was the result of a saddle pulmonary embolus, a blood clot caused by the gunshot wounds which occluded the artery to the lungs.

The State rested its case in chief. Defendant's motion for judgments of acquittal [was] overruled.

Defendant testified that on the morning of September 6, 1986, he went to Riverfront Park. There he met two men with whom he pooled his money for the purchase of a fifth of wine. He and one of the men moved about in that general area of town during which time the man mentioned having a .38 caliber pistol but needed shells. They went to Service Merchandise where this person purchased a box of cartridges upon signing the log and entering an identification number. They returned to Riverfront Park and then to defendant's camp site where defendant did target practice with the man's pistol. At noon he went to lunch and returned to the camp. The men were still at his camp. Later defendant walked to Lebanon Road and Fessler's Lane where he was arrested.

He acknowledged being brought back to the Riverfront Park. He testified that he did not know he was in a line-up. When shown a picture of the line-up he identified one participant as the man who purchased the shells that morning.

Defendant explained that his statement to Sergeant Jacobs of having never fired a gun had reference to a gun used to murder someone. He was unable to explain why he had first said his dog had been with him all day and changed to say the dog was not with him all day. He denied shooting the Wallaces.

The State called Billy Joe Camden as a rebuttal witness. This was the man who had purchased the box of shells at Service Merchandise on lower Broadway. Camden made the purchase at the request of the defendant. While they were together the defendant did not have his dog with him. After the purchase of the ammunition they went their separate ways. He did not go to the defendant's camp site nor witness him fire a gun. He was taken from Riverfront Park for the line-up. Camden testified that he owned a .22 caliber rifle but never owned a .38 caliber pistol.

*State v. Bell*, No. 88-138-II, 1989 WL 86583, at *1-4 (Tenn. Crim. App. Aug. 4, 1989). After hearing closing arguments and deliberating, the jury returned verdicts of guilty on both murder counts against Bell. Bell was sentenced to life in prison for the first degree murder of Jean Lynn Wallace and received a consecutive twenty-year sentence for the second degree murder of Herman Harrison Wallace.

Also among the state's witnesses at Bell's trial was William Davenport, a convicted felon held with Bell in the Nashville jail during the period prior to Bell's trial. In September 1986, Davenport contacted the Davidson County District Attorney General's Office by letter, indicating that he had information about the Bell case. On October 13, 1986, Ronald Miller, the prosecutor assigned to Bell's case, met with Davenport. Notes taken by Miller during that meeting document Davenport's report that Bell admitted murdering the Wallaces. They also suggest that Davenport desired a transfer into a different facility, the "Red Building," and movement into a work release program. The notes also seem to refer to Davenport's parole eligibility status. In November 1986, following Miller's meeting with Davenport, the district attorney's office, through a separate attorney, elected not to prosecute four criminal counts pending against Davenport. Davenport received concurrent sentences on two remaining charges.

When called by the government at Bell's March 1987 trial, Davenport testified that Bell said that he shot Herman Wallace during the course of an argument in which Bell was inebriated or "messed up." According to Davenport, Bell said that he shot Jean Wallace because "she was there" and expressed no remorse for either killing. Bell's defense counsel, Ross Alderman, attacked Davenport's account on cross-examination, suggesting that Davenport was an incredible witness due to his criminal history and his prior Ku Klux Klan membership. During his closing argument, Alderman again challenged Davenport's veracity, emphasizing Davenport's criminal history and parole status. Miller attempted to undermine Alderman's implication that Davenport had an incentive to lie to the jury and denied that Davenport's decision to testify had anything to do with any promises from his office. He stated at closing, "Mr. Alderman would have you believe that [Davenport] wants an early parole through our office or through me. Well, I don't have any say-so with the Parole Board; they are going to let him go soon enough anyway. I have nothing to do with what they do in their own respective realms." Shortly after Bell's trial, however, Miller did send a letter to the Board of Pardons and Parole on Davenport's behalf requesting parole "at the earliest possible date." Davenport was granted early parole in June 1987.

Following his conviction, Bell filed a direct appeal to the Tennessee Court of Criminal Appeals, raising a number of claims. The appeals court denied the appeal on all grounds on August 4, 1989, and the Tennessee Supreme Court denied Bell's petition for review on November 6, 1989. Bell then sought post-conviction relief in state court. On November 2, 1992, the trial court denied him relief, and the Tennessee Court of Criminal Appeals affirmed the trial court's denial on August 4, 1994. Bell sought permission to appeal to the Tennessee Supreme Court, but the state supreme court denied his appeal on January 3, 1995.

On June 12, 1995, Bell filed a *pro se* petition for a writ of *habeas corpus* in the United States District Court for the Eastern District of Tennessee. The court transferred Bell's petition to the United States District Court for the Middle District of Tennessee. After the court denied Bell's motion for partial summary judgment on March 31, 1997, there was no further action in the case for more than a year, and, as a result, the court dismissed the case without prejudice on October 23, 1998. Bell moved to reopen the case, and the court granted the motion on June 2, 1999. In an amended petition, filed September 6, 2000, Bell alleged fourteen constitutional violations. Two of those claims are relevant to the matter before us. Bell argued that the prosecution violated the Fourteenth Amendment by withholding favorable evidence from him in contravention of *Brady*, thereby depriving him of due process. He further claimed a violation of his Sixth Amendment right to the effective assistance of counsel, alleging that his trial counsel were ineffective for failing to investigate his history of alcoholism and mental illness and to place those issues before the jury as factors undermining the government's proof of premeditation. The government thereafter moved to dismiss the petition, and the district court granted that motion on April 26, 2002, as to nine of Bell's claims on procedural default grounds. As to the remainder of Bell's claims–including his *Brady* and ineffective assistance claims–the court decided that their resolution would require discovery.

The district court conducted an evidentiary hearing on January 22 and 27, 2004. On January 22, Bell introduced an expert report prepared by Dr. Pamela Mary Auble. Dr. Auble's report detailed Bell's lengthy history of alcohol and drug abuse and his mental health problems. The report concluded that Bell's intoxication or mental illness could have compromised his mental state at the time of the Wallace murder, thus eliminating his ability to engage in a premeditated killing. Alderman testified at the hearing that he did investigate Bell's mental health history and alcoholism but defended his decision not to pursue these issues as a possible defense tactic because Bell insisted upon his innocence and wanted Alderman to assert an identity defense, that is, that Bell was not the killer. In addition, Alderman represented that because Bell had been ruled competent to stand trial, he could not prevail on a theory of insanity. Finally, Alderman testified that, although he submitted a discovery request to the government prior to trial, he received no information concerning Davenport's communications with the prosecution or his criminal background. Nevertheless, Alderman acknowledged that he knew that Davenport was seeking early parole and that he had been able to argue at closing that Davenport provided testimony in order to receive the benefit of early parole.

At the hearing's continuation on June 27, Miller testified. He conceded many of the facts related to his interactions with Davenport. However, Miller expressly denied promising Davenport anything in exchange for his testimony. In explaining his decision to submit a letter to the parole board on Davenport's behalf, Miller stated, "I didn't promise Davenport anything, and I didn't make any agreements with him, but he testified at trial against someone I thought was dangerous, and I felt that he would now be labeled as a snitch, and it might be best that I did whatever I could do to get him out of prison, whenever the parole board thought he would be eligible."

On March 26, 2004, the district court issued a written order denying all of Bell's remaining claims. As to Bell's *Brady* claim, the court ruled that Miller's letter to the parole board was created after trial and thus could not have been disclosed pretrial. The court determined that the prosecution should have turned over the materials tending to prove that Davenport was seeking favors from the government in exchange for his testimony but held that Bell had not shown that the omission of these documents deprived him of a fair trial. With respect to Bell's claim that his counsel was deficient, the court held that Alderman did adequately investigate Bell's history of substance abuse and blackouts and ordered a pretrial mental evaluation of Bell. Because Bell was found competent to stand trial and because Bell insisted on his innocence, Alderman pursued a defense based on identity. The district court concluded that this tactical decision was consistent with Sixth Amendment standards. Bell appealed to this court after receiving a certificate of appealability from the district court on his *Brady* and Sixth Amendment claims.

On appeal, a divided panel of our court reversed, concluding that the prosecution unlawfully withheld evidence of a tacit agreement between Davenport and Miller, the notes documenting Miller's meeting with Davenport, and sentencing records from the separate criminal proceedings against Davenport. Concluding that there was a reasonable probability of a different result had these materials been properly disclosed, the panel granted relief on Bell's *Brady* claim. The panel affirmed the denial of Bell's ineffective assistance of counsel claim. The Warden successfully sought rehearing *en banc*, and the original panel decision was vacated.[2]

---

[2]Judge Moore's dissenting opinion questions the justification for granting *en banc* review in this case, asserting that the case does not present a question of exceptional public importance but only a difference of opinion as to what facts permit the inference of a tacit agreement. As explained *infra* at note 6, it is precisely the panel majority's conclusion that the facts of this case permit such an inference that would create a new definition of *Brady* material and a new legal rule broadly applicable in federal criminal prosecutions as well as *habeas* proceedings. If the panel majority's opinion remained as binding precedent, the impact would be enormous. While ordinarily factual issues do not merit *en banc* rehearing, this one does.

II.

A.

In assessing the correctness of the district court's decision on Bell's petition, we evaluate the district court's factual findings for clear error and review the district court's ultimate refusal to grant *habeas* relief *de novo*. *Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir. 2000). As to the standard applicable to any relevant state court rulings, Bell asserts that the highly deferential review standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), does not apply to his claims because he filed his initial petition before the enactment of the statute. *See Williams v. Taylor*, 529 U.S. 362, 402 (2000). The Warden responds that the district court dismissed Bell's original petition without prejudice, and Bell's amended petition was filed after AEDPA's effective date. Therefore, argues the Warden, AEDPA applies.

The parties' dispute is immaterial. In the present case, AEDPA's applicability is relevant only to the extent that we must review a state court's ruling on Bell's claims. As explained *infra*, Bell failed to present either of his claims to the state courts, and there is, therefore, no state court decision on these issues for us to review. We accordingly apply *de novo* review to Bell's constitutional claims. *See Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006).

B.

Bell seeks *habeas* relief on the ground that the prosecution failed to turn over impeachment materials relating to William Davenport, a government witness. In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. A successful *Brady* claim requires a three-part showing: (1) that the evidence in question be favorable; (2) that the state suppressed the relevant evidence, either purposefully or inadvertently; (3) and that the state's actions resulted in prejudice. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).[3]

Bell cites three items that he contends constituted favorable impeachment evidence subject to disclosure under *Brady*. First, Bell points to notes Miller took during his October 1986 meeting with Davenport. Those notes reveal that Davenport sought consideration for his assistance in the proceedings against Bell. Second, Bell argues that the prosecution was obligated to turn over the sentencing records from the case against Davenport. Those records show that the district attorney

---

[3]The Warden argues that we are not permitted to entertain Bell's *Brady* claim because he failed to present it to the state courts prior to bringing his claim in federal court and his claim is now procedurally defaulted. For his part, Bell does not contest the Warden's representation that he did not assert a *Brady* violation in state court. Under both the pre-AEDPA and AEDPA regimes, Bell was required to exhaust the remedies available to him in Tennessee's courts prior to seeking relief in federal court. *See* 28 U.S.C. § 2254(b) (1994); 28 U.S.C. § 2254(b)(1)(A) (1996). Where a petitioner fails to exhaust his state remedies "and the court to which the petitioner would be required to present his claim in order to meet the exhaustion requirement would now find the claims procedurally barred . . . there is a procedural default for purposes of federal *habeas* . . . ." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (emphasis added). Because Tennessee law limits an inmate to only one postconviction petition, Tenn. Code Ann. § 40-30-102(a), Bell is precluded from returning to state court to exhaust his *Brady* claim properly, and his claim is therefore procedurally defaulted. A *habeas* petitioner who defaults on his federal claims in state court is barred from bringing those claims in federal court unless he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. As the Supreme Court explained in *Banks v. Dretke*, the cause and prejudice standard tracks the last two elements of a *Brady* claim: suppression by the government and materiality. 540 U.S. 668, 691 (2004) (citing *Strickler*, 527 U.S. at 282). We therefore choose to focus our attention on the merits of Bell's claim with the understanding that our decision on the merits resolves any issues as to procedural default.

decided not to prosecute Davenport on two charges of grand larceny and two charges of concealing stolen property. They also show that Davenport received concurrent sentences on two additional criminal charges. Third, Bell claims that Davenport and Miller had an implied agreement or understanding that Miller would seek early parole for Davenport in exchange for his inculpatory testimony against Bell. That agreement, Bell argues, was subject to disclosure pursuant to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972). We consider each of these items in light of the three-part test outlined above.

1.

The *Brady* rule applies to evidence that is exculpatory in nature as well as evidence that a defendant could use at trial to impeach a government witness. *See United States v. Bagley*, 473 U.S. 667, 676-77 (1985). As to the notes from Miller's October 1986 meeting with Davenport, we agree with the district court that the prosecution was under an obligation to turn those notes over to Bell prior to trial. The documents from that meeting include four notations of significance: (1) an indication that Davenport unilaterally contacted the district attorney's office to provide assistance in the Bell case; (2) a note that Davenport "want[ed] to go to the Red Building"; (3) what appears to be an outline of Davenport's scheduled prison release dates; and (4) a reference to a work release program. Collectively, Miller's notes, though cryptic, confirm that Davenport sought out the district attorney's office and provide support for the claim that he requested preferential treatment–in the form of a facility transfer or work release–in return for his assistance. This information is proper impeachment material and should have been disclosed to Bell prior to trial. *See United States v. Risha*, 445 F.3d 298, 303 n.5 (3d Cir. 2006) ("There can be no dispute that the information in question is favorable to the defense because [a witness's] expectation of lenience in the state proceedings could have been used to impeach him."). The sentencing documents arising out of the proceedings against Davenport are also impeachment material, qualifying as evidence of his prior convictions, and should have been disclosed. *See Crivens v. Roth*, 172 F.3d 991, 998 (7th Cir. 1999) ("We conclude, therefore, that the state did, as a matter of law, improperly withhold [witness's] criminal history record from [defendant].")

We take a different view, however, of Bell's assertion of a tacit agreement or "understanding" that was subject to disclosure under *Brady*. It is well established that an express agreement between the prosecution and a witness is possible impeachment material that must be turned over under *Brady*. *Giglio*, 405 U.S. at 154-55. The existence of a less formal, unwritten or tacit agreement is also subject to *Brady*'s disclosure mandate. *See, e.g.*, *Wisehart v. Davis*, 408 F.3d 321, 323-24 (7th Cir. 2005). If Bell could prove that Davenport and Miller had reached a mutual understanding, albeit unspoken, that Davenport would provide testimony in exchange for the district attorney's intervention in the case against him, such an agreement would qualify as favorable impeachment material under *Brady*. On the record before us, however, we are unable to conclude that such an agreement existed here.

In support of his assertion of an implied agreement, Bell relies in part on the notes from Miller's discussion with Davenport on October 3, 1986. He argues, in addition, that the events following this meeting–specifically, the resolution of the case against Davenport–confirm the existence of an agreement between Davenport and Miller. The record confirms Bell's claim that Davenport contacted the district attorney's office in the hope of receiving a benefit in exchange for his assistance. Indeed, Miller testified at the evidentiary hearing before the district court that, although he was not certain what Davenport wanted, "[e]verybody wants something, and I'm sure Davenport wanted something."

The fact that Davenport desired favorable treatment in return for his testimony in Bell's case does not, standing alone, demonstrate the existence of an implied agreement with Miller. A witness's expectation of a future benefit is not determinative of the question of whether a tacit

agreement subject to disclosure existed. *See id.* at 325 ("[W]hat one party might expect from another does not amount to an agreement between them."). Although Davenport may have been seeking more lenient treatment in his own case, we find no evidence of a corresponding assurance or promise from Miller. Miller testified at the evidentiary hearing before the district court that he did not promise Davenport anything in exchange for his testimony, stating unequivocally that he "made no agreements with Mr. Davenport at all." When asked at his parole hearing about Miller's letter to the parole board and Davenport's participation in the Bell case, Davenport stated that he "got nothing out of that whatsoever."

Nor do we believe that the handling of Davenport's case after his meeting in October 1986 proves the existence of an understanding. As to the disposition of the six counts pending against Davenport, Bell does not direct us to any reliable evidence that the prosecutor or judge assigned to Davenport's case had any awareness that Davenport was planning to render assistance in the Bell case.[4] Without evidence to the contrary, one could just as reasonably conclude that the result in Davenport's case merely reflects the standard operations of the criminal justice system, in which the state offers leniency to defendants in exchange for their pleas of guilty. *Cf. Wisehart*, 408 F.3d at 324 ("[M]ost criminal cases are disposed of pursuant to plea agreements that involve concessions on [the government's] part."). Moreover, Bell relies too heavily upon Miller's subsequent decision to transmit a letter to the parole board. In his letter, Miller mentions Davenport's cooperation in the case against Bell, but also notes the threat of possible retaliation by other prisoners as a reason for granting Davenport early parole. In light of Miller's sworn statement before the district court that he had no agreement with Davenport, we have no reason to believe that an undisclosed agreement was the true reason for Miller's letter to the parole board.

In sum, although we do not take issue with the principle that the prosecution must disclose a tacit agreement between the prosecution and a witness, it is not the case that, if the government chooses to provide assistance to a witness following a trial, a court must necessarily infer a preexisting deal subject to disclosure under *Brady*. "The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony." *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003) (emphasis in original). To conclude otherwise would place prosecutors in the untenable position of being obligated to disclose information prior to trial that may not be available to them or to forgo the award of favorable treatment to a participating witness for fear that they will be accused of withholding evidence of an agreement.

Bell has not adequately demonstrated the existence of an understanding between Davenport and Miller concerning his testimony at Bell's trial. "Without an agreement, no evidence was suppressed, and the state's conduct, not disclosing something it did not have, cannot be considered a *Brady* violation." *Todd v. Schomig*, 283 F.3d 842, 849 (7th Cir. 2002).[5] The result advocated by Judge Clay in his dissenting opinion would create a new definition of *Brady* material that includes

---

[4] Bell notes in his brief that the attorney prosecuting Davenport's case, Katie Novak, "later became Miller's wife," implying that Novak was somehow complicit in the purported arrangement between Davenport and Miller. Bell's bare suggestion is not enough to convince us that this was the case, however.

[5] Bell also argues that Miller's letter to the parole board was *Brady* material. However, as the district court correctly observed, Miller drafted that letter after Bell's trial and could not have disclosed it pretrial. The letter is useful to Bell only as evidence of a possible agreement between Davenport and Miller concerning Davenport's testimony. For the reasons set forth above, we do not believe that the materials Bell cites, including the letter, amount to proof of an understanding, implied or otherwise.

possible post-trial witness favorable treatment – something never previously considered by any court to be within *Brady*'s ambit.[6]

2.

We next consider whether a *Brady* violation occurred because the prosecution did not disclose the favorable evidence-the sentencing records and the notes from Miller's 1987 meeting. With respect to the sentencing records, the Warden argues that those records were publicly available and that Bell could have obtained access to them.

The Warden is correct that the sentencing records were available to Bell. Moreover, because Davenport's testimony derived from statements Bell made to him while they were in jail together, Bell easily could have pursued any pending charges against Davenport and their disposition. In fact, Davenport mentioned a pending charge as a reason for his incarceration during his testimony. Under such circumstances, our court has made clear that a *Brady* violation does not occur. *See Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007) ("Where, like here, 'the factual basis for a claim is 'reasonably available to' the petitioner or his counsel from another source, the government is under no duty to supply that information to the defense.") (citation omitted); *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (There is no *Brady* violation where information is available to the defense "because in such cases there is really nothing for the government to disclose.").

The dissent faults the majority's reliance on our case law regarding withheld information that is readily available to the defense from another source. Instead, it says that this issue is controlled by two Supreme Court cases: *Strickler* and *Banks*. The dissent reasons that *Strickler* and *Banks* compel the conclusion that a *Brady* violation occurred because the prosecutor in this case represented to Bell's counsel that he had turned over all discoverable information in his file.

In our view, *Strickler* and *Banks* do not call our precedents into question and do not counsel a conclusion that there was a *Brady* violation with respect to the nondisclosure of the sentencing records. Neither case involves information remotely similar to the public sentencing records not given to the defense in this case. Rather, both involve information known to investigating officers that defendants had no reason to know about and that could not have been discovered by defendants without an extensive and possibly fruitless investigation. In *Strickler,* the withheld information consisted of notes taken by a detective during interviews with a key witness and letters from the witness to the detective. 527 U.S. at 266 & 273-75. In *Banks*, the undisclosed evidence included the status of one witness as a paid police informant who had provided information about the defendant's involvement in the case and interviews that police and prosecutors conducted with another witness who denied in his testimony that he had spoken to anyone about his testimony. 540 U.S. at 675-76. Given these facts, the Supreme Court readily concluded that Strickler and Banks had shown cause for failing to present their *Brady* claims in state court because they had reasonably relied on the prosecutor's open file policy and assertions during state proceedings that everything known to the government had been disclosed.[7] *Strickler*, 527 U.S. at 289; *Banks*, 540 U.S. at 698.

---

[6]Such an expansion of the definition of *Brady* has legal implications as well as factual ones. And because prosecutors so frequently use cooperating witnesses in criminal trials, the practical effect of such a definition is great.

[7]As previously mentioned, the Supreme Court observed in *Banks* that the cause and prejudice standard tracks the last two elements of a *Brady* claim: suppression by the government and materiality. 540 U.S. at 691 (citing *Strickler*, 527 U.S. at 282). The cause analysis adopted by the Court includes examination of whether a defendant reasonably relied on the government's representation. *Id.* at 692 (citation omitted). Similarly, analysis of whether material was suppressed by the government involves consideration of reasonable reliance. *Id.* at 698. *Cf. Jennings v. McDonough*, 490 F.3d 1230, 1238-39 (11th Cir. 2007) ( "[T]here was no suppression of [a] tape" where defendant had knowledge of a witness and "had within his knowledge information by which he could have ascertained her statement."); *Gantt v. Roe*, 389 F.3d 908, 913 (9th Cir. 2004) ("Though defense counsel could have conducted his own investigation, he was

By contrast, in this case the known fact of Davenport's incarceration strongly suggested that further inquiry was in order, whether or not the prosecutor said he had turned over all the discoverable evidence in his file, and the information was a matter of public record. *See Matthews*, 486 F.3d at 890-91 (concluding that witness's withdrawal of original guilty plea, plea to reduced charges, and resentencing were public information and that government could not have "disclosed" information "readily available to the defense"); *Spirko v. Mitchell*, 368 F.3d 603, 611(6th Cir. 2004) (holding that where evidence is available from sources other than the state and defendant was "aware of the essential facts necessary for him to obtain that evidence," the *Brady* rule does not apply). The absence of reasonable reliance distinguishes this case from *Strickler* and *Banks*.

3.

Turning to the notes from Miller's 1987 meeting with Davenport, which were not otherwise available to Bell, we examine whether the failure to disclose those notes amounted to constitutional error. The Supreme Court has held that error of constitutional magnitude occurs only when the production of the evidence would have created a "reasonable probability" of a different result. *Bagley*, 473 U.S. at 682. As the Court noted in *Kyles v. Whitley*:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). Thus, if Bell can show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," he will prevail. *Id*. at 435.

Without question, Miller's notes would have provided support for the defense theory that Davenport expected some benefit in return for his testimony against Bell and was therefore not a credible witness. Despite the absence of the notes, however, Alderman did challenge the purity of Davenport's motives during his closing argument, stating:

> [Y]ou have got to decide whether you want to believe somebody who was on parole, violated that parole, was in jail, all this involving a crime involving fraud and false

---

surely entitled to rely on the prosecution's representation that it was sharing the fruits of the police investigation.") The terminology provides opportunity for confusion, however, because the government's withholding of evidence does not necessarily mean that it has suppressed the evidence for purposes of ascertaining whether a *Brady* violation has occurred. And whether a *Brady* violation is ultimately found is not determinative of the extent of the prosecutor's broad duty to disclose exculpatory evidence. The Court itself recognized in *Strickler* the differing uses of the terms:

> This special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that not every violation of that duty necessarily establishes that the outcome was unjust. Thus the term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence -that is, to any suppression of so-called "*Brady* material"-although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

527 U.S. at 281-82. In this opinion we use the term "*Brady* violation" in the strict sense of the term. Thus, saying that a particular nondisclosure was not a *Brady* violation in no way suggests that the prosecutor did not have a duty to disclose the information.

dealings, theft – . . . . I [Davenport] want you to believe [my testimony] . . . because I have got a parole hearing coming up in a matter of months and if I can go to the Parole Board and I can say, 'I have helped convict Stephen Michael Bell,' that they might cut me some slack because they violated my last parole when I committed another crime . . . . That is why I called the District Attorney's office; that is why I spoke to the police and the District Attorney and that is why I came to testify, but you believe me.

The notes from Davenport's meeting with Miller could have bolstered Bell's credibility attack on Davenport's motives, but any assistance would have been modest. The jury was apprised of Davenport's status and the possible other reasons for his decision to testify, namely, that he wished to secure early parole as a result of his participation in the Bell case. Documentation would not have permitted the development of alternate theories or different lines of argument. Thus, the inclusion of the withheld material could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

We conclude, therefore, that Miller's notes from his meeting with Davenport were not material, and the district court correctly denied relief on Bell's *Brady* claim.

C.

Bell also claims that his trial counsel rendered ineffective assistance of counsel. Because we agree with the original panel's resolution of this issue, affirming the district court's denial of relief on Bell's claim, we reinstate the original panel decision as to that claim. *See Getsy v. Mitchell*, 495 F.3d 295, 315 (6th Cir. 2007); *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 270 (6th Cir. 1998).

III.

For the foregoing reasons, we affirm the judgment of the district court denying Bell's claim for *habeas* relief.

———————

**DISSENT**

———————

CLAY, Circuit Judge, dissenting. In its effort to avoid the conclusion that the state violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the majority makes three basic missteps. First, the majority disregards the reasoning of the Supreme Court and blames Petitioner for refusing to discover evidence the prosecution said did not exist. Second, the majority ignores the weight of the evidence and the absence of findings by the district court, and instead holds that no tacit agreement existed between William Davenport and the prosecution. Finally, the majority concludes that the prosecution's withholding of evidence was not prejudicial, thereby implying that because Petitioner made an impeaching argument, it was irrelevant that he was deprived of the evidence to support it. I disagree with the majority on all three points, and therefore respectfully dissent.

**I.**

The facts recounted by the majority and the Tennessee Court of Appeals are generally correct. Rather than repeat a lengthy recitation of the facts, I will limit this discussion to those aspects insufficiently developed by the majority.

Petitioner's trial was held on or about the beginning of March, 1987. At trial, the prosecutor, Ronald Miller, called Davenport as a witness against Petitioner. Davenport claimed that Petitioner approached him in jail and asked what "they would do on a double murder." J.A. at 256. Petitioner allegedly proceeded to discuss the charges in detail, recounting that he had gotten into an argument over his dog with Herman Wallace. Davenport stated that Petitioner admitted that he had been intoxicated, and had ended up shooting Mr. Wallace. Petitioner also allegedly confessed to shooting Jean Wallace, who was Mr. Wallace's wife, because "she was there." J.A. at 257. Davenport testified that Petitioner did not seem remorseful about killing the two people.

On cross-examination, Petitioner brought out Davenport's five felony convictions for charges including forgery, fraud, and receiving and concealing stolen property. Davenport admitted that he was familiar with the criminal justice system, that he was currently incarcerated, and that he had a parole hearing on December 5, 1987. Davenport also admitted that he at one time adhered to the beliefs of the Ku Klux Klan.

During closing, Petitioner argued that Davenport lacked credibility because of his convictions for crimes involving fraud and false dealings, and because of his membership in the Klan. He also contended that Davenport should not be believed because Davenport had

> a parole hearing coming up in a matter of months and if [he] can go to the Parole Board and [he] can say, "I have helped to convict Stephen Michael Bell," that they might cut [him] some slack. . . . That is why [he] called the District Attorney's office; that is why [he] spoke to the police and the District Attorney and that is why [he] came to testify.

J.A. at 275.

Miller argued in favor of Davenport's credibility during closing. According to Miller, Davenport testified because Petitioner "came there and told him what had happened and he had no remorse and no sorrow whatsoever and that is why he [Davenport] was in here testifying and telling you what he heard." J.A. at 277. Miller also claimed that though "[Petitioner] would have you believe that [Davenport] wants an early parole through our office or through me," Miller did not "have any say-so with the Parole Board; they are going to let him go soon enough anyway. I have

nothing to do with what they do in their own respective realms." J.A. at 277. The jury convicted Petitioner for the first-degree murder of Mrs. Wallace, and the second-degree murder of Mr. Wallace.

On March 19, 1987, approximately two weeks after Petitioner's trial, Miller sent a letter to the Board of Pardons and Paroles requesting that Davenport "be considered for parole at the earliest eligible date." J.A. at 501. Miller stated that "the State did not have a strong case without the testimony of William Davenport" and that "[p]rior to talking to Mr. Davenport, we did not have any idea as to the motive for the killings." J.A. at 501. According to Miller, early parole was justified on account of Davenport's cooperation and the possibility of retaliation from other prisoners. In June of 1987, the Board granted Davenport parole, apparently in advance of his release eligibility date.[1]

After pursing a direct appeal and state post-conviction relief, Petitioner brought a petition for a writ of habeas corpus. The district court concluded that an evidentiary hearing was necessary to resolve certain issues raised by Petitioner, including the *Brady* issue. The court accordingly held an evidentiary hearing in January of 2004.

At the evidentiary hearing, Miller's testimony revealed that Davenport had initiated contact with the prosecution by sending a letter to the district attorney that was eventually passed on to Miller.[2] Miller had met with Davenport on October 3, 1986, after receiving Davenport's letter. Miller's notes from that meeting (the "Notes") indicate that Davenport "want[ed] to go to [the] Red Building," which was a preferred minimum security facility, and that he was interested in work release. The Notes also suggest a discussion of Davenport's prior convictions, as well as the date that Davenport would be eligible for parole.

Though Miller could not remember many of the specifics of his conversation with Davenport, he acknowledged that Davenport wanted something in exchange for his testimony. Miller denied, however, making any agreements with Davenport. Miller stated that he wrote the letter to the parole board on behalf of Davenport because "he testified at trial against someone I thought was dangerous, and I felt that he would now be labeled as a snitch, and it might be best that I did whatever I could do to get him out of prison." J.A. at 475. Though Miller stated that the case against Petitioner would have proceeded to trial without Davenport's testimony, Miller reaffirmed that the state did not have a good case without Davenport.

Ross Alderman, Petitioner's trial attorney, also testified at the evidentiary hearing. His testimony revealed that, although documents reflecting the disposition of Davenport's criminal charges were responsive to Petitioner's *Brady* request, the prosecution did not provide Petitioner any documents concerning Davenport.[3] Instead, the prosecution claimed that it had provided Petitioner with "all discoverable information in [its] file." J.A. at 499. Sometime after trial, Petitioner discovered that the same prosecuting office handling Petitioner's case had *nolle prosequied* four pending criminal charges against Davenport, which consisted of two counts of grand larceny and

---

[1] The record is unclear as to when exactly Davenport was eligible for parole. At Petitioner's trial, Davenport testified that his parole eligibility date was December 5, 1987. A handwritten note on a copy of the letter written by Miller suggests a parole eligibility date of November 25, 1987.

[2] This letter is not in the record, and counsel for Petitioner stated at oral argument that the letter disappeared while in possession of the state, and has never been disclosed to Petitioner.

[3] Specifically, Petitioner asked for "[t]he nature and substance of any preferential treatment given at any time by any state agent, whether or not in connection to this case to any potential witness" and "[t]he FBI and state arrest and conviction records of each witness the state intends to call in this matter." J.A. at 441.

two counts of concealing stolen property, after Davenport's meeting with Miller but before his testimony at Petitioner's trial. On the same date that the charges were *nolle prosequied*, Davenport pled guilty to writing worthless checks and concealing stolen property, and received prison time to be served concurrently with time he was already serving.

In his post-hearing brief, Petitioner argued that Miller's interactions with Davenport demonstrated an exchange of favorable treatment for testimony that should have been disclosed to Petitioner. This exchange, Petitioner contended, when combined with the evidence of the Notes and Davenport's *nolle prosequied* charges, entitled Petitioner to relief under *Brady*. The district court rejected Petitioner's *Brady* claim. The court concluded that Miller's letter to the parole board did not exist at the time of trial and could not be disclosed, and though the Notes should have been turned over to Petitioner, they were not material under *Brady*. The district court made no findings as to whether a tacit agreement existed between Davenport and Miller, and also failed to analyze Davenport's *nolle prosequied* charges.

A panel of this Court reversed, holding that the evidence of a tacit agreement, the Notes, and Davenport's *nolle prosequied* charges was improperly suppressed under *Brady*. *Bell v. Bell*, 460 F.3d 739, 750-57 (6th Cir. 2006). The Court also concluded that this evidence was material, and therefore Petitioner was entitled to relief under *Brady*. *Id.* at 757-59. Respondent moved for rehearing *en banc*, which this Court granted on December 15, 2006, thereby vacating the panel opinion.

## II.

The sole issue is whether Petitioner established a *Brady* violation. I agree with the majority that we review this issue *de novo*, and that the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996), does not constrain our review. Majority Op. at 7.

## A.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. To prevail on a *Brady* claim, a petitioner must establish three elements: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Exculpatory and impeaching evidence are measured by the same constitutional standard. *United States v. Bagley*, 473 U.S. 667, 676-77 (1985).

*Brady* represents a limited departure from our adversarial system, which is justified by the overarching concern that the defendant receives a fair trial. *Id.* at 675 & n.6. The *Brady* rule recognizes that the state's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)); *Strickler*, 527 U.S. at 281 (noting the "special role played by the American prosecutor in the search for truth in criminal trials"). Requiring the prosecutor to disclose favorable evidence "tend[s] to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations." *Kyles*, 514 U.S. at 439.

## B.

There is no dispute that both the Notes and the prosecutor's decision to *nolle prosequi* several of Davenport's pending criminal charges constituted favorable impeaching evidence.

Likewise, there is no dispute that the prosecution suppressed the Notes. The majority argues, however, that because evidence reflecting the disposition of Davenport's criminal charges was available to Petitioner in the public records, the prosecution did not suppress such evidence. For this reason, the majority refuses to consider the disposition of Davenport's pending criminal charges in its materiality analysis. The majority's holding is erroneous as a matter of law, and it threatens to reintroduce the gamesmanship that *Brady* and its progeny were designed to prevent. Petitioner specifically requested impeaching evidence concerning the criminal arrests and convictions of the prosecution's witnesses, which would have included the disposition of Davenport's criminal charges. The prosecution responded to that request without alerting Petitioner to the existence of these documents, claiming instead that all discoverable documents had been disclosed, despite the fact that the documents were in the prosecution's possession. Accordingly, the prosecution suppressed this evidence, notwithstanding its availability to Petitioner through the public records.

Two Supreme Court cases establish that a prosecutor's false or misleading statement disclaiming the existence of *Brady* material obviates the need for a petitioner to conduct an independent investigation. Such material, if in the prosecution's possession, and if not disclosed, is therefore suppressed under *Brady*, even if it is available through another source. In *Strickler*, the issue before the Court was whether the petitioner had "cause" for failing to raise his *Brady* claim before the state trial court, 527 U.S. at 283, which, as the Supreme Court has explained, tracks *Brady*'s "suppression" element. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). The warden argued that because facts suggesting the basis for the petitioner's *Brady* claim were publicly available, through trial testimony and a newspaper article, the prosecution's maintenance of an open-file policy that did not include the evidence in question was irrelevant. *Strickler*, 527 U.S. at 284. The Supreme Court rejected this argument. Though the Court disagreed with the warden's contention that the factual basis for the petitioner's claim was publicly available, it did not rely on this fact in crafting the applicable legal standard.[4] *Id.* at 285. Instead, the Court held that the petitioner established cause because (1) "the prosecution withheld exculpatory evidence," (2) "petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence," and (3) the state asserted that petitioner had received "everything known to the government." *Id.* at 289.

In *Banks*, the Supreme Court reaffirmed and extended *Strickler*, and reversed the Fifth Circuit's holding that the petitioner could not demonstrate cause because he was not diligent in investigating his *Brady* claim. 540 U.S. at 695. The *Banks* Court did not take a position on whether further investigation would have led to the suppressed material; instead, the Court found cause because the prosecution (1) "knew of, but kept back" the *Brady* material; (2) "asserted . . . that it would disclose all *Brady* material;" and (3) confirmed the petitioner's reliance on that representation by denying contrary allegations in state habeas proceedings. *Id.* at 693. In rejecting the warden's argument, *Banks* clearly indicated that a contrary rule "declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process." *Id.* at 696 (framing the state's argument that the petitioner was not diligent as an argument that "the prosecution can lie and conceal and the prisoner still has the burden to discover the evidence" and rejecting this argument (alternation and internal citation removed)); *see also id.* at 695 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."). The rule emerging from *Strickler* and *Banks* is clear: Where the prosecution makes an affirmative representation that no *Brady* material exists, but it in fact has *Brady* material in its possession, the petitioner will not be penalized for failing to discover that material.

---

[4] The Supreme Court declined to reach the question of whether a different result would follow if "the defendant [were] aware of the existence of the documents in question and knew, or could reasonably discover, how to obtain them." *Strickler*, 527 U.S. at 288 n.33. This question is not raised by the instant case, because Petitioner was not aware of the existence of Davenport's *nolle prosequied* charges.

The majority's attempt to distinguish this case from *Strickler* and *Banks* on the basis of "absence of reasonable reliance" is utterly unpersuasive. Majority Op. at 11. Petitioner specifically requested that the prosecution provide impeaching evidence concerning its witnesses, which would have included Davenport's sentencing documents. Accordingly, when the prosecution did not provide any of those sentencing documents and informed Petitioner that it had provided "all discoverable information in [its] file," J.A. at 499, Petitioner was entitled to "presume that [these] public officials [had] properly discharged their official duties" and that no relevant documents existed. *Banks*, 540 U.S. at 696 (quoting *Bracy v. Gramley*, 520 U.S. 899, 909 (1997)). Under *Strickler* and *Banks*, Petitioner's ability to uncover the disposition of Davenport's criminal charges by searching public records did not relieve the prosecution of its duty to respond honestly and completely to Petitioner's discovery request.

The majority's mischaracterization of *Strickler* and *Banks* is even more egregious in light of the courts of appeals' consistent interpretation of these cases. Several of our sister circuits have recognized that prosecutors cannot knowingly misrepresent that *Brady* material does not exist without running afoul of *Banks* and *Strickler*, see *Jennings v. McDonough*, 490 F.3d 1230, 1239 & n.8 (11th Cir. 2007) (denying *Brady* claim where the petitioner had equal access to the evidence and "there is no allegation that the prosecution actively misled [the petitioner] about the existence of the [*Brady* evidence]"); *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) ("[I]f the State failed under a duty to disclose the evidence, then its location in the public record, in another defendant's file, is immaterial."); *Gantt v. Roe*, 389 F.3d 908, 912-13 (9th Cir. 2004) ("While the defense could have been more diligent . . . this does not absolve the prosecution of its *Brady* responsibilities. . . . Though defense counsel could have conducted his own investigation, he was surely entitled to rely on the prosecution's representation that it was sharing the fruits of the police investigation."), as have several separate opinions of this Court. *See United States v. Graham*, 484 F.3d 413, 422 (6th Cir. 2007) (Batchelder, J. dissenting) ("[T]he defense is entitled to rely on the prosecution's representations regarding its compliance with its *Brady* obligations."); *Bell*, 460 F.3d at 767 (panel opinion) (Gibbons, J. dissenting) ("Miller . . . did not disclose . . . Davenport's sentencing documents, . . . which could have been used for impeachment. Thus, the failure to disclose them was contrary to the requirements of *Brady* and its progeny.")[5]; *cf. Harbison v. Bell*, 408 F.3d 823, 833 (6th Cir. 2005) (distinguishing *Banks* because there "the prosecution had repeatedly asserted that all *Brady* material was disclosed, but nevertheless continued to conceal such material"); *Puertas v. Overton*, 168 F. App'x 689, 706 (6th Cir. 2006) (unpublished) ("The Supreme Court has repeatedly held that a defendant can reasonably rely on the prosecution's representation that it has disclosed all *Brady* evidence, and that once the prosecution confirms this representation, the defendant is under no further duty to investigate additional *Brady* materials.").

As the majority notes, *Matthews v. Ishee* held that "[w]here . . . 'the factual basis for a claim' is 'reasonably available to' the petitioner or his counsel from another source, the government is under no duty to supply that information to the defense," even though the government had misled the petitioner by assuring the jury that the material in question did not exist. 486 F.3d 883, 891 (6th Cir. 2007) (quoting *Strickler*, 527 U.S. at 283 n.24). We are not, however, presently bound by *Matthews*. Because an examination of *Matthews* reveals that it misconstrues *Banks* and *Strickler*, we should decline to follow it.

First, *Matthews* misreads the portion of *Strickler* that purportedly supports its conclusion. *Strickler* asserted that the prosecution's open-file policy and refusal to disclose *Brady* material were

---

**5**The authoring judge of the majority opinion originally believed that Davenport's sentencing documents were suppressed by the prosecution, as indicated by her now-vacated panel dissent. She now argues in the majority opinion herein that the sentencing documents were not suppressed by the prosecution. The fact that the judge authoring the majority opinion herein has taken contradictory positions on this issue certainly detracts from the persuasiveness of the majority opinion.

factors that established "cause" under *Murray v. Carrier*, 477 U.S. 478, 488 (1986), because they constituted "conduct attributable to the Commonwealth that impeded trial counsel's access to the factual basis for making a *Brady* claim." *Strickler*, 527 U.S. at 283. In support of this proposition, *Strickler* quoted *Murray*: "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel *or* that some interference by officials made compliance impracticable, would constitute cause under this standard." *Id.* at 283 n.24 (emphasis added) (internal citations and quotation marks omitted) (quoting *Murray*, 477 U.S. at 488). Clearly *Strickler* was quoting *Murray* to establish that "interference by officials" constituted cause–as discussed above, *Strickler* did not attach legal relevance to the petitioner's potential inability to discover the *Brady* material by following up on the public documents. *Matthews*, however, quotes only the "not reasonably available" example of cause highlighted by *Murray*, while ignoring the "interference by officials" example actually at issue in *Strickler*. *See* 486 F.3d at 891.

Furthermore, *Matthews*' analysis is flawed because it draws a distinction between "cases when the government has sole possession of investigative notes or memoranda" and cases based on public information, *id.* at 890-91, notwithstanding *Stricker*'s and *Banks*' implicit rejection of this distinction. In *Banks*, the Court disregarded the warden's argument that the factual basis for the petitioner's claim was available from other sources, *see Banks*, 540 U.S. at 694-96; likewise, in *Strickler*, the Court declined to condition its test on the petitioner's inability to locate the *Brady* material. Instead, the Court crafted a legal rule that focused on whether the prosecutor made false or misleading representations concerning information in its possession. *Strickler*, 527 U.S. at 289; *Banks*, 540 U.S. at 693.

Finally, *Matthews* is inconsistent with the policies that *Brady* and its progeny are intended to promote. Forbidding prosecutors from making false representations concerning information within their possession furthers *Brady*'s goal of fair trials, and is consistent with the "'special role played by the American prosecutor in the search for truth in criminal trials.'" *Banks*, 540 U.S. at 696 (quoting *Strickler*, 527 U.S. at 281). The contrary rule is antithetical to both of these concerns. The *Matthews* rule also encourages the type of unsavory gamesmanship that the Supreme Court has thought unfit for litigation that stakes the defendant's liberty on the jury verdict. *See id.* ("Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation." (citing *Kyles*, 514 U.S. at 440)).[6]

In this case, Miller represented that there was no discoverable information in his file relating to Davenport. This representation was false or misleading, as his office was in possession of Davenport's sentencing documents. Accordingly, the prosecution suppressed the evidence of its decision to *nolle prosequi* several of Davenport's pending criminal charges.

## C.

In *Giglio v. United States*, the Court held that *Brady* required the disclosure of an agreement between the prosecution and its witness. 405 U.S. 150, 154-55 (1972). This rule requires the disclosure of "promises of reward" and "inducements" offered to witnesses. *Bagley*, 473 U.S. at 683-84. The Supreme Court has specifically held that making a promise of reward or inducement contingent on the prosecution's satisfaction does not exempt it from disclosure. *See id.* But beyond this general parameter, the Court has provided little guidance on how broadly or narrowly "promises of reward" or "inducements" should be construed, and no specific instructions on how *Giglio* applies to tacit agreements.

---

[6]The majority also relies on *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004), but that case is inapposite because it did not involve a false or misleading statement made by the prosecution.

The majority, like several of our sister circuits, does not take issue with the general principle that tacit agreements, like explicit agreements, must be disclosed under *Giglio*. *See, e.g.*, *Wisehart v. Davis*, 408 F.3d 321, 323 (7th Cir. 2005) (holding that the witness could be impeached by a "tacit understanding that if his testimony [were] helpful to the prosecution, the state would give him a break on some pending criminal charge"); *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) ("[F]acts which imply an agreement . . . bear on [the witness's] credibility and would have to be disclosed."); *cf. Giglio*, 405 U.S. at 153 n.4 (suggesting that disclosure is required where the United States Attorney's affidavit "contains at least an implication that the Government would reward the cooperation of the witness," which "tend[ed] to confirm rather than refute the existence of some understanding for leniency"). Reading *Giglio* and *Bagley* to require prosecutors to disclose tacit agreements is undoubtedly the correct result, as the same policies justifying the disclosure of explicit agreements also compel the disclosure of tacit agreements. Like explicit agreements, tacit agreements are likely to be relevant to credibility, and therefore should be disclosed to the jury. *See Giglio*, 405 U.S. at 155. Indeed, tacit agreements may be *more* likely to skew the witness's testimony. In the case of an explicit agreement, the testifying witness will know what he can expect to receive in exchange for his testimony, and will know the conditions he must fulfill. When a witness is instead led to believe that favorable testimony will be rewarded in some unspecified way, the witness may justifiably expect that the more valuable his testimony, the greater the reward. *See* R. Michael Cassidy, *"Soft Words of Hope:"* Giglio, *Accomplice Witnesses, and the Problem of Implied Inducements*, 98 Nw. U. L. Rev. 1129, 1154 (2004) ("The more uncertain the inducement, the greater the witness's incentive to tailor his testimony to please the government, precisely because the witness does not know exactly what he will get for his cooperation, and hopes for the very best."); *cf. Bagley*, 473 U.S. at 683 ("The fact that the [witnesses'] stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction.").[7]

The threat of incorrect jury verdicts is further increased by tacit agreements because, when testifying, a witness whose agreement is tacit, rather than explicit, can state that he has not received any promises or benefits in exchange for his testimony. By definition, tacit agreements are not concrete or explicit. *See* Blacks Law Dictionary 325, 1465 (7th ed. 1999) (defining "tacit" as "[i]mplied but not actually expressed; implied by silence or silent acquiescence," and defining "tacit contract" as "[a] contract in which conduct takes the place of written or spoken words in the offer or acceptance (or both)"). And given the absence of any formal arrangements, a witness's statement that he has no expectation of favorable treatment concerns only his subjective understanding, and cannot typically be demonstrably falsified. Likewise, the prosecutor can argue to the jury that the witness is testifying disinterestedly,[8] which artificially increases the witness's credibility–artificially, that is, because the premise of the argument is false. *See* Cassidy, *supra*, at 1132 (noting that the prosecutor's ability to argue that no benefits have been conferred is advantageous). If the tacit agreement is not disclosed, the defendant is left with only argument, not evidence, to attempt to counter the credibility that improperly accrues to the witness on account of his supposedly pure motive.

---

[7]Empirical evidence also supports the conclusion that implicit promises are as likely to skew a witness's testimony as explicit promises. *See* Saul M. Kassin & Karlyn McNall, *Police Interrogations and Confessions: Communicating Promises and Threats by Pragmatic Implication*, 15 Law & Hum. Behav. 233, 248 (1991) ("In short, . . .our data indicate that because people often process information 'between the lines', [explicit and implicit promises and threats] are functionally equivalent in their impact.").

[8]This danger is not hypothetical. Here, the prosecutor implied that Davenport was motivated by altruistic motives. *See* J.A. at 277 (Miller's closing argument) ("Bill Davenport told you that the man [Petitioner] came there [to Davenport in jail] and told him what happened and he had no remorse and no sorrow whatsoever and *that is why he* [Davenport] *was in here testifying and telling you what he heard*." (emphasis added)).

In order to guard against these dangers and facilitate *Brady*'s ultimate purpose of ensuring fair trials, this Court should hold that two types of evidence are subject to disclosure. First, any evidence that reasonably suggests that the prosecutor conveyed an expectation of favorable treatment to the testifying witness should be disclosed. *See Shaffer*, 789 F.2d at 690; *Reutter v. Solem*, 888 F.2d 578, 582 (8th Cir. 1989) (holding that the state must disclose evidence of the witness's impending commutation hearing notwithstanding the district court's finding that no agreement existed between the state and the witness); *cf. Giglio*, 405 U.S. at 153. This expectation creates the incentive for false testimony, and the jury should be allowed to consider this evidence and decide for themselves whether the prosecutor's conduct affected the witness's testimony, regardless of whether the witness acknowledges a subjective understanding that he is testifying pursuant to a *quid pro quo* exchange.

Second, the prosecution should be required to disclose any evidence in its possession that suggests that the witness actually harbors an expectation of favorable treatment, regardless of whether the prosecution created such an expectation. *See United States v. Risha*, 445 F.3d 298, 303 n.5 (3d Cir. 2006) ("There can be no dispute that the information in question is favorable to the defense because [the witness's] expectation of leniency in the state proceedings could have been used to impeach him."); *Todd v. Schomig*, 283 F.3d 842, 849 (7th Cir. 2002) ("Todd cannot prove an agreement existed. He argues that at the very least [the witness] had an 'expectation' of benefit. But what one party might expect from another does not amount to an agreement between them. *And Todd does not argue that the state knew of [the witness's] expectation*." (emphasis added)). *Brady*'s concern is not with prosecutorial bad faith, but with accurate outcomes. *See* 373 U.S. at 87; *see also Bagley*, 473 U.S. at 675. Even if the prosecution was wholly innocent in creating the witness's unfounded impression that favorable testimony would be rewarded, that impression nevertheless has the ability to color the witness's testimony in favor of the prosecution. The prosecution should not be able to knowingly suppress evidence of a witness's expectation of favorable treatment merely because the prosecution did not willfully cultivate it.

Construing "promises of reward" or "inducements" to include these two types of evidence would promote the disclosure of evidence actually likely to bias prosecution witnesses. In contrast to the rule proposed by the majority, which would require something akin to a formal agreement before any evidence was subject to disclosure, *see* Majority Op. at 10; *see also Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003) ("The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony."), this rule would foreclose a crafty prosecutor's strategy of eschewing a formal agreement, only to achieve the same result through innuendo or implication. Additionally, it would resolve the nebulous issue of determining whether subjective expectations had given rise to a mutual understanding between the prosecution and the witness by making that issue one for the jury. If the prosecution made statements implicitly offering leniency in exchange for testimony, or if the witness made statements implying that he possessed such an expectation, the jury could consider whether an agreement existed, and weigh the witness's testimony accordingly.

The majority mischaracterizes the rule proposed by the dissent as creating "a new definition of *Brady* material that includes possible post-trial witness favorable treatment." Majority Op. at 10. The rule proposed by the dissent does not require pre-trial discovery of post-trial witness treatment. Rather, the dissent simply proposes that we adopt the conclusion compelled by *Giglio* and *Bagley* – namely, that the prosecution must disclose evidence of any possible tacit agreements between it and prosecution witnesses prior to trial.

In the case before us, though Miller's testimony at the evidentiary hearing confirms that no explicit agreements existed, his testimony does not preclude the possibility that he conveyed an expectation of lenient treatment that he intended to fulfill. *See* J.A. at 475 ("I didn't promise

Davenport anything, and I didn't make any agreements with him . . . ."). Similarly, the district court made no factual findings on this matter. If such a mutual understanding occurred, then a tacit agreement existed between Davenport and the prosecution, which was subject to disclosure under *Giglio*, 405 U.S. at 154-55.

The evidence in this case strongly suggests that a tacit agreement existed between the prosecution and Davenport. This inquiry involves the choice between two competing hypotheses: Either the prosecution provided favorable treatment to Davenport because of an implied understanding that valuable testimony would be rewarded, or the prosecution never reached an implied understanding with Davenport, and Davenport independently provided valuable testimony, at which point the prosecutor decided to reward him. If the former occurred, the tacit agreement should have been disclosed; if the latter occurred, no *Brady* violation occurred because no *Brady* material existed. *Compare, e.g., Shaffer*, 789 F.2d at 689, *with Todd*, 283 F.3d at 849.

The first hypothesis is significantly more plausible, for two reasons. First, the course of dealings between the parties suggests that a mutual understanding existed. Davenport approached Miller seeking to provide testimony in exchange for favorable treatment. Miller made a notation of the preferential treatment that Davenport sought. Shortly thereafter, and before Davenport testified, the prosecuting office *nolle prosequied* two counts of grand larceny and two counts of concealing stolen property against Davenport. And approximately two weeks after Davenport provided incriminating testimony and Petitioner was convicted, Miller wrote a letter to the parole board–which accords with the Notes' indication that Davenport's parole date was discussed. This course of conduct is unlikely to be the result of coincidence, thus lending support to the contention that an unstated understanding existed between Miller and Davenport.

Second, neither prosecutors nor jailhouse informants are generally disposed to altruistic behavior, and the fact that a testifying jailhouse witness subjects himself to personal danger makes such behavior even less likely to stem from disinterested motivations. *See* J.A. at 475 (testimony of Miller) ("I felt that [Davenport] would now [after testifying] be labeled as a snitch, and it might be best that I did whatever I could do to get him out of prison."). Prosecutors are aware of this expectation, and have every incentive to encourage it. *See* J.A. at 476 ("Everybody wants something, and I'm sure Davenport wanted something."). The parties' incentives therefore encourage the creation of tacit agreements.

In sum, the record in this case strongly, though not conclusively, suggests the existence of a tacit agreement. Generally speaking, whether the prosecution and the witness reached an unspoken understanding is a factual matter for the state court or federal district court. Here, Petitioner argued before the district court that the record demonstrated a tacit agreement, but the district court made no factual findings on the matter. In light of this record, the majority errs by unjustifiably resolving this factual matter against Petitioner, thereby expounding an unduly restrictive and incorrect view of tacit agreements as a matter of law.[9]

### D.

A petitioner can establish prejudice by showing that "there is a reasonably probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. This standard does not require that it is more likely than not that the verdict would have been different without the evidence, and is substantially less demanding than a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434. The prejudicial effect of any

---

[9] Even under the majority's erroneous view of prejudice, the case should be remanded so that the district court can resolve this factual issue. However, because the Notes and Davenport's *nolle prosequied* charges establish prejudice under *Brady*, remand is unnecessary.

favorable evidence suppressed by the state must be viewed cumulatively, as opposed to item-by-item, and if the suppressed evidence collectively establishes prejudice, no harmless error inquiry is necessary. *Id.* at 435-36.

Davenport's testimony was critical to the prosecution. Petitioner was convicted of first-degree murder with respect to Mrs. Wallace, and Davenport provided the only direct evidence of premeditation, which was a necessary element of the offense. *See State v. Johnson*, 661 S.W.2d 854, 860 n.1 (Tenn. 1983) (quoting Tenn. Code. Ann. § 39-2-202 (defining first degree murder), *repealed*, 1989 Pub. Acts ch. 591, § 1)). Davenport's testimony was also crucial to the prosecution's second-degree murder case because it provided the only direct evidence that Davenport was the shooter, thereby greatly strengthening what was otherwise a weak and entirely circumstantial case.[10]

In light of the state's insubstantial case, the importance of Davenport's testimony cannot reasonably be disputed. Miller, in fact, acknowledged that "the state did not have a strong case without the testimony of William Davenport." J.A. at 501. Miller reaffirmed this statement during habeas proceedings. If the jury disbelieved Davenport's testimony, they could easily have acquitted Petitioner on both counts, as the remaining evidence required the jury to make considerable inferential leaps in order to connect the gaps in the state's case.

Had the Notes and the evidence of the *nolle prosequied* charges been disclosed by the state, there is a reasonable probability that the jury would have returned a verdict of not guilty on both counts. These pieces of evidence, considered cumulatively, would have supplied proof of Davenport's self-interested motive, and a juror considering Davenport's testimony in light of this evidence might well have concluded that Davenport had seized an opportunity to fabricate a story to serve his own purposes. To recount, the Notes demonstrated that Davenport had approached Miller seeking specific benefits. The Notes also indicated that Miller knew what benefits Davenport sought, and that Miller was aware of Davenport's parole eligibility. This evidence would have allowed the jury to infer that Davenport was testifying due to an expectation of lenient treatment, which in turn would have provided the jury with a substantial reason to doubt the veracity of Davenport's testimony. *See Shaffer*, 789 F.2d at 688-89 (finding materiality where the evidence impeached a witness whose credibility was vital to the outcome of the trial); *Reutter*, 888 F.2d at 581-82 (finding a reasonable probability of a different outcome where the jury was not informed of the existence of an impending commutation hearing of a key witness).

The *nolle prosequied* charges were also valuable impeaching evidence. In evaluating this basis for impeaching Davenport's credibility, the relevant question is not whether the disposition of Davenport's charges and his offer to testify were actually linked. Instead, the evidence would have proved valuable if the jury could have found that Davenport believed that these events were connected. The jury here could easily have found that Davenport thought that his offer to testify caused the favorable result he received on his pending criminal charges. Davenport would have known that he and Miller discussed his convictions, and that the same prosecuting office had extended Davenport a highly favorable plea arrangement approximately one month later. This evidence would have aided Petitioner's impeachment efforts in two distinct but mutually reinforcing ways. First, Petitioner could have argued that Davenport's receipt of favorable treatment from the prosecution motived Davenport to skew his testimony out of gratitude or a sense of obligation. *See Wisehart*, 408 F.3d at 324 (noting that testimony can be affected by benefits previously bestowed). Second, the receipt of favorable treatment in the past may have amplified Davenport's expectation that a good performance on the witness stand would lead to lenient treatment, providing Davenport

---

[10]The physical evidence in the case consisted of laboratory results indicating that Petitioner could have fired a gun, and bullets of the same type used in the murder found on Petitioner at the time of his arrest. The state lacked the murder weapon, eyewitnesses to the crime, or physical evidence, such as blood, that connected Petitioner to the victims.

with an increased incentive to shape his testimony to benefit the prosecution. The logic is simple: If the prosecution rewarded Davenport for making efforts to cooperate, it stands to reason that further cooperation will lead to additional rewards. This incentive would be especially strong considering that the benefits that Davenport sought had not yet been bestowed.

The majority's first error in considering prejudice stems directly from its failure to consider Davenport's *nolle prosequied* charges suppressed. Because this evidence is not included in the majority's calculus, the majority ignores the fact that Petitioner was deprived of the opportunity to argue that Davenport had already received favorable treatment from the prosecution. This error also affects the overall magnitude of the impeaching evidence, which of course must be considered cumulatively. *See Kyles*, 514 U.S. at 436.

The majority errs again in discrediting the suppression of the Notes because "[t]he jury was apprised of Davenport's status and the possible other reasons for his decision to testify, namely, that he wished to secure early parole as a result of his participation in the Bell case." Majority Op. at 18. Here, the flaw in the majority's reasoning is that it allows *argument* to substitute for *evidence*. Though the jury was aware that Davenport had an upcoming parole hearing, they were provided with no evidence that Davenport's parole hearing was connected to his decision to testify. As it was, Petitioner's claim that Davenport was testifying in order to increase his chances of a favorable result at the parole hearing must have struck the jury as unsubstantiated speculation. Had Petitioner instead proved his claim with reliable evidence provided by the prosecutor himself, there is a reasonable probability that Petitioner's argument would have convinced the jury, which in turn would have discredited Davenport.

Additionally, the majority ignores two other valuable arguments that Petitioner could have advanced had he been in possession of the Notes and the *nolle prosequied* charges. First, as noted above, Miller suggested to the jury that Davenport was motivated to testify by his abhorrence of Petitioner's lack of sorrow and remorse. Armed with the suppressed evidence, Petitioner could have met this suggestion with powerful evidence that Davenport's testimony was opportunistic, not altruistic. Second, Miller misleadingly told the jury that he had no "say-so" with the parole board. By demonstrating that Miller had seen fit to record the date of Davenport's parole eligibility, Petitioner could have mustered some argument that Miller, though lacking formal authority, might be able to exercise some measure of influence. At the very least, the fact that Davenport knew that his parole hearings were discussed with Miller would have provided a basis for arguing that Davenport thought Miller capable of bestowing such a favor on his behalf.

In sum, the suppressed evidence handicapped Petitioner's efforts to discredit Davenport. Had the evidence been disclosed, there is a reasonable probability that the jury would have doubted Davenport and acquitted Petitioner.

### III.

For the foregoing reasons, I respectfully dissent.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  Although I agree fully with the primary dissenting opinion, I write separately to express my befuddlement regarding the reason for rehearing this case en banc.  The text of Federal Rule of Appellate Procedure 35 is clear:  "An en banc hearing or rehearing is not favored."  Fed. R. App. P. 35(a).  Rule 35 limits the reasons for granting rehearing en banc to (1) ensuring "uniformity of the court's decisions," and (2) resolving "a question of exceptional importance."  *Id.*  The text of our parallel circuit rule is clear as well:  "A suggestion for rehearing en banc is an *extraordinary procedure* which is intended to bring to the attention of the entire Court a precedent-setting error of *exceptional public importance* or an opinion which *directly conflicts* with prior Supreme Court or Sixth Circuit precedent."  6 Cir. R. 35(c) (emphasis added).  And lest anyone think that a panel's "getting it wrong" qualifies as a matter of exceptional public importance, our Rule notes that "[a]lleged errors . . . in the facts of the case (including sufficient evidence), or errors in the application of correct precedent to the facts of the case, are matters for panel rehearing *but not for rehearing en banc*."  *Id.* (emphasis added).

After reading the panel's decision and the parties' supplemental briefs, I was uncertain why a majority of this court had agreed to rehear this case en banc.  Nowhere did either of the parties identify any inconsistency of the panel's decision with prior decisions of this court (or with Supreme Court decisions, for that matter).  Nor did the parties highlight any question of exceptional importance.  To the contrary, the briefs reflected a rather pedestrian disagreement regarding whether Petitioner Bell had offered sufficient evidence to establish a tacit agreement.

I had hoped that oral argument would clarify my confusion.  Certainly, I thought, either the advocates or my colleagues on the bench would highlight the exceptional importance of this case.  I had believed that after oral argument, I would see clearly that this dispute was not just a question of whether record evidence supported the panel majority's opinion, but instead a complicated *legal* question that required fourteen seasoned legal minds to resolve.  Suffice it to say, I am disappointed.

The entire debate at oral argument—as in the briefs—centered not on *whether* a petitioner could premise a *Brady* violation on the prosecutor's failure to disclose a tacit agreement.  The State's counsel conceded—both in its brief, Appellee's Supp. Br. at 12, and at oral argument—that *Brady* and its progeny support such a rule.  Instead, the parties disputed whether Bell's evidence *established* such an agreement.  In other words, the State argued that the panel had gotten the facts wrong—that the evidence was insufficient, notwithstanding the panel's opinion.  But as noted above, such an argument has no place before the en banc court.  *See* 6 Cir. R. 35(c).

We do not convene en banc to exercise plenary review over panel decisions.  Yet that is precisely what has happened here because the State has failed to identify either a conflict between the panel decision and binding precedent or a matter of exceptional public importance that this case raises.  Because I believe that Federal Rule of Appellate Procedure 35(a) and Sixth Circuit Rule 35(c) preclude us from reviewing en banc the panel's decision, I would **DISMISS** the petition for rehearing en banc as improvidently granted.  I respectfully dissent on that basis.  Having failed to convince my colleagues that we should dismiss the petition as improvidently granted, I join the primary dissent on the merits.

---

**DISSENTING IN PART AND CONCURRING IN PART**

---

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting in part and concurring in part.

I agree with Judge Moore that rehearing *en banc* was improvidently granted in this case and, for that reason, I would vacate the order granting rehearing and reinstate the panel opinion. The dispositive question in this section 2241 matter boils down to the sufficiency or insufficiency of the evidence presented on the petitioner's behalf in district court and, therefore, fails to meet the requirements of Federal Rule of Appellate Procedure 35(a).

That said, however, because the panel opinion has been vacated by order of a majority of the court, it becomes necessary to redetermine the principal issue raised on appeal. On that score, I would vote in conformity with the majority's analysis of the facts and hold that the evidence fails to establish the existence of a tacit agreement between the state prosecutor, Miller, and the state's witness, Davenport.